# In the United States Court of Federal Claims

No. 16-113C
Filed: July 9, 2021
FOR PUBLICATION

---

**WESTDALE NORTHWEST CENTER, LP,**

                     *Plaintiff,*

**v.**

**UNITED STATES,**

                     *Defendant.*

---

*Jennifer A. Gehrt*, Barbee & Gehrt, LLP, Dallas, TX, for the plaintiff.

*Michael D. Austin* and *Mariana Acevedo*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Helen Kerns*, General Services Administration, of counsel, for the defendant.

## TRIAL OPINION

***HERTLING*, Judge**

The parties in this contract dispute seek review of a property-tax provision in a lease for office space. The plaintiff, Westdale Northwest Center, LP ("Westdale"), leases office space at an office building it owns in San Antonio, Texas, to the defendant, the United States, acting through the General Services Administration ("GSA"). The subject lease was negotiated and signed by GSA and a previous owner of the building, Griffin Partners, Inc. ("Griffin Partners"), from which Westdale subsequently acquired the building.

Several years into the lease, following a GSA audit, a disagreement arose regarding the proper interpretation of a lease clause related to annual real-estate taxes. The original contracting parties established a fixed tax base for the building. This tax base was incorporated into a formula to be reflected in the lease to ensure that for each annual payment of the owner's real-estate taxes GSA would only pay taxes proportional to the share of the building it occupied. The formula was intended to adjust GSA's payment to the lessor depending on whether the building's real-estate taxes that year exceeded or fell below the established tax base. The parties to this litigation agree that the tax base written into the lease—$133,045—does not accomplish the parties' goal.

The parties disagree as to the implications of the incorrect figure. Westdale petitions this Court to enforce the contract as written because the plain language of the tax-adjustment clause

is unambiguous. The defendant asserts the defense of mutual mistake in contract formation, arguing that the former lessor and GSA were incorrect in their belief that the tax-adjustment clause as written would accomplish the goal of ensuring that GSA pays only its proportional share of the building's real-estate taxes each year. The defendant seeks reformation of the contract to accomplish the original intent of the parties.

The Court held a three-day trial from January 25 to January 27, 2021, to take testimony regarding the understanding and intent of the former lessor and GSA at the time of contract formation.

Based on the testimony and evidence before it, the Court determines that the tax-adjustment clause as written was the product of a mutual mistake by GSA and the former lessor. The Court finds that contract reformation is the appropriate remedy. Accordingly, the Court reforms the lease to reflect the parties' agreed-upon methodology for calculating the tax base for the purposes of determining GSA's yearly real-estate tax payment owed to Westdale under the terms of the lease.

## I.      FACTS[1]

The Court sets forth findings of fact as required by Rule 52(a)(1) of the Rules of the Court of Federal Claims ("RCFC"). In making its factual findings, the Court relies on the testimony elicited at trial and the documentary evidence submitted by the parties. The Court heard testimony from six witnesses. The plaintiff called three witnesses: Mr. Jeff Allen, executive vice president for Westdale, the current lessor; Ms. Rhonda Thompson, the director of commercial-asset management and leasing for Westdale; and Ms. Kelli Williamson, a commercial financial analyst for Westdale. The defendant called Ms. Kelly Winn, the real-estate broker for GSA. Both parties called Mr. Lee Moreland, executive vice president in charge of asset management for the former lessor, Griffin Partners, and Ms. Tracy Harter, the GSA contracting officer for the lease at issue. In addition to testimony, the Court considered the parties' Joint Stipulation of Facts, the five exhibits submitted by the plaintiff, the four exhibits from the defendant, and the 80 joint exhibits in evidence. The Court found all witnesses to be credible.

### A.      The 2004 Lease Between GSA and SAOP

The property at issue is an office building known as Northwest Center, located at 7550 IH 10 West in San Antonio, Texas ("building" or "property"). (Jt. Stip. ¶ 3.) On June 3, 2004, GSA agreed to a lease ("2004 lease") with SAOP Northwest Center, L.P. ("SAOP") to secure office

---

[1] In its factfinding, the Court cites the parties' Joint Stipulation of Facts ("Jt. Stip.") (ECF 114), the transcript of testimony elicited during trial ("Tr.") (ECF 131-133), and the plaintiff's ("PX"), defendant's ("DX"), and joint ("JX") exhibits admitted into evidence at trial. Citations to exhibits are to the appropriate abbreviation followed by the exhibit and page number or paragraph number: (e.g., DX 1 at 2; Jt. Stip. ¶ 7).

space. (*Id.*; JX 39.) At that time, SAOP owned the Northwest Center. (Tr. 128 (Moreland).) SAOP was a single-asset entity of Griffin Partners, a commercial real-estate investment and management company.[2] (*Id.*; Tr. 44-46 (Allen).) The space leased by GSA under the 2004 Lease served as offices for the Administrative Office of the United States Courts in San Antonio. (JX 39 at 3.)

GSA issued a Solicitation for Offers ("SFO") as part of its acquisition of office space. The 2004 lease incorporated all terms and conditions of GSA's SFO. (JX 39 at 2.) Section 3.4 of the SFO was titled "Tax Adjustment (Sep 2000)." (*Id.* at 14.) Paragraph B of section 3.4 initially provided as part of the printed form: "Base year taxes as referred to in this paragraph are 1) the real estate taxes for the first 12-month period coincident with full assessment or 2) may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property." (*Id.*)

The printed phrase "coincident with full assessment or" was struck out of paragraph B by hand and initialed by two representatives. (*Id.*) That phrase was replaced by new text typed above paragraph B. (*Id.*) As amended, paragraph B provided: "Base year taxes as referred to in this paragraph are 1) the real estate taxes for the 12-month period *1998, which were $413,020.00 or $1.71 per rentable square foot* 2) may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property." (*Id.* (emphasis added).) Thus, the lessor and GSA selected a prior tax year to serve as the real-estate tax base and deviated from the original text of the SFO. The $413,020 in real-estate taxes assessed against the property in 1998 was lower than the $525,153.66 in taxes assessed against the property in 2004, the year the parties agreed to the lease.[3] (JX 78 at 2.)

**B.      The 2009 Solicitation for Offers, Response, and Attachments**

Due to the pending expiration of the 2004 lease, GSA issued SFO 8TX3135 on August 19, 2009, seeking office space "for Federal Public Defender and Administrative Office of the United States Courts in San Antonio, Texas." (JX 1B at 1.) The SFO identified a ten-year lease term with "five (5) years firm term." (*Id.* at 5.) The SFO permitted GSA to terminate the lease in whole or in part with written notice after the fifth year. (*Id.*) The SFO required offerors to submit offers by December 31, 2009, (*id.*), though the deadline was extended to January 15, 2010, (JX 1D).

---

[2] The Court at times refers to SAOP and Griffin Partners interchangeably as "owners" of the building, although only SAOP held legal title to the building. No significance is intended by the choice of terminology.

[3] For the purposes of this litigation, there are no disputes regarding the payment of real-estate taxes under the 2004 lease. Information pertaining to the 2004 lease is included to contextualize the tax-adjustment clause of the parties' 2010 lease at issue in this case.

SAOP submitted an offer in response to the SFO on January 15, 2010. (Jt. Stip. ¶ 5.) Pursuant to paragraph 3.0 of the 2009 SFO, SAOP submitted its bid package to Ms. Kelly Winn, a broker with Studley, Inc. and the authorized real-estate broker for GSA, and Ms. Daphne Hadley, the GSA contracting officer for the lease. (DX 4 at 15.)

Paragraph 3.4 of the SFO required each offeror to submit to the contracting officer, as part of its offer, seven different forms. (JX 1B at 15-16.) These forms included GSA Form 1364 ("Proposal to Lease Space") and GSA Form 1217 ("Lessor's Annual Cost Statement"). (*Id.*)

### 1.    GSA Form 1364: Proposal to Lease Space

As part of SAOP's offer, it submitted GSA Form 1364. (DX 2.)[4] The SFO specified that both pages of GSA Form 1364 had to be completed and specifically noted that offerors should indicate the total lease rate per square foot, "clearly itemizing . . . the total building shell rental." (JX 1B at 15.) The SFO further noted that "[t]his building shell rental rate shall include, but not limited to [sic], property financing (exclusive of Tenant Improvements), insurance, *taxes*, management, profit, etc., for the building." (*Id.* (emphasis added).)

On SAOP's submitted Form 1364, it described the property as a 25-year-old building of 241,404 rentable square feet ("rsf"). (DX 2 at 1.) Line 16 of Form 1364 was titled "SHELL RENT (including current real estate taxes. Refer to Line 28 on GSA Form 1217)." (*Id.*) SAOP identified the shell rent on line 16 as $14.32, the amortized cost per rentable square foot. (*Id.*) On line 27 of the form, SAOP identified the "current year taxes" as "2009" and wrote "$691,942." (*Id.* at 2.) SAOP checked a box indicating that the 2009 taxes were "based on the fully assessed value." (*Id.*)

### 2.    GSA Form 1217: Lessor's Annual Cost Statement

SAOP also submitted GSA Form 1217 ("Lessor's Annual Cost Statement") with its offer, as required by the SFO. (DX 1; JX 1B at 15-16.) Form 1217 was divided into two main sections. Section I, comprised of Lines 5 through 27, referred to the "Estimated Annual Cost of Services & Utilities Furnished by Lessor as Part of Rental Consideration." (DX 1 at 1-2.) Section II, which included lines 28 through 33, referred to the "Estimated Annual Cost of Ownership Exclusive of Capital Charges." (*Id.* at 2.) For each section, column (a) represented costs for the entire building, and column (b) represented costs pertaining to the area leased by

---

[4] The version of DX 2 the defendant initially provided was dated January 12, 2010. Because the exhibit omitted a portion of the page likely due to a photocopying error, the Court permitted the defendant to re-submit DX 2. The defendant submitted a new version of DX 2, but the revised version was dated March 22, 2010, and includes minor deviations from the prior version of DX 2 and handwritten notations apparently due to "clarifications with the offeror." (DX 2 at 1 (revised).) The new DX 2 lists, for example, a larger percent of government occupancy. Ms. Winn testified that the handwritten additions to DX 2 (revised) reflect her negotiations with the lessor. (Tr. 424 (Winn).) The Court admitted the revised DX 2 into evidence. (*Id.* at 425.)

GSA. (*Id.* at 1.) At the time SAOP submitted Form 1217, its bid proposed that GSA lease an area of 43,119 rsf. (*Id.*) Line 28 of Form 1217 was titled "REAL ESTATE TAXES." (*Id.* at 2.) On line 28, in column (a), SAOP listed the lessor's annual cost for real estate taxes as $726,629. (*Id.*) On line 28(b), which referred specifically to the area leased by the government, SAOP identified the real-estate taxes as $129,788.19.[5] (*Id.*) Line 28 of Form 1217 thus provided the following information:

| SECTION II - ESTIMATED ANNUAL COST OF OWNERSHIP EXCLUSIVE OF CAPITAL CHARGES | | |
|---|---|---|
| | LESSOR'S ANNUAL COST FOR: | |
| | ENTIRE BUILDING (a) | GOV'T-LEASED AREA (b) |
| **28. REAL ESTATE TAXES** | $ 726,629 | $ 129,788.19 |

(*Id.* (reformatting for clarity; column (c) omitted).)

## C. Original Lease

GSA awarded the 2010 lease ("original lease") to SAOP. (Jt. Stip. ¶ 6.) On October 19, 2010, SAOP and GSA agreed to U.S. Government Lease for Real Property No. GS-07B-16737. (*Id.*) The lease between the parties was a standard government form lease that was prepared by GSA. (JX 1B at 13.) SAOP drafted no part of the lease. (Tr. 134 (Moreland).)

Under the original lease, GSA occupied 44,201 rsf of office and related space in the building. (Jt. Stip. ¶ 6.) For months 1 through 60 of the lease term, the annual rent was $1,087,786.61, at the rate of $90,648.88 per month. (*Id.* ¶ 7.) For months 61 through 120, the annual rent was $1,060,824.00, at the rate of $88,402.00 per month. (*Id.*) At the outset of the original lease, GSA occupied 18.309894 percent of the building. (*Id.* ¶ 8.) The original lease permitted GSA to "terminate this lease in whole or in part at any time on or after the fifth (5th) year by giving at least 120 days' notice in writing to the Lessor." (JX 1A at 2.)

### 1. Incorporated Documents and Integration

Paragraph 7 of the original lease specified that the lease incorporated five documents: (1) the SFO, including two amendments; (2) GSA Form 3517, entitled "General Clauses"; (3) GSA Form 3518, entitled "Representations and Certifications"; (4) "Exhibit A—Base Plan"; and (5)

---

[5] At the time SAOP submitted Form 1217 in January 2010, SAOP estimated GSA's building occupancy to be 43,119 rsf. SAOP and GSA later agreed to a slightly larger leased area of 44,201 rsf. (DX 1 at 2; JX 1A.) The estimated real-estate taxes on Form 1217 were thus calculated using a smaller square-footage of occupancy than is reflected in the final lease.

"Exhibit B—Legal Description." (*Id.*) The original lease did not specify that it incorporated any other documents. (*See* JX 1A.)

The General Clauses form, incorporated into the original lease, included General Clause 552.270-27, an integration clause:

> This Lease, upon execution, contains the entire agreement of the parties and no prior written or oral agreement, express or implied, shall be admissible to contradict the provisions of the Lease.

(JX 1E at 5.) The original lease was therefore a fully integrated agreement.

Between execution of the original lease in 2010 and July 2013, GSA and SAOP executed 12 supplemental lease agreements amending the lease. (Jt. Stip. ¶ 10.)

## 2.    Tax-Adjustment Provisions

The original lease contained provisions intended to determine the amount of property tax GSA would pay relative to its occupancy in the building. Paragraph 15 of the original lease provided in full:

> In accordance with the SFO Paragraph 4.2 entitled "Tax Adjustment," this lease is subject to real estate tax adjustment. The base amount is established as $133,045.00. The percentage of occupancy is 18.309894%.

(JX 1A at 3.)[6] Paragraph 15 is the "tax-adjustment clause" primarily at issue in this dispute.

The SFO, which was incorporated into and referenced in paragraph 15 of the original lease, provided definitions and specific instructions for calculating the tax base. Paragraph 4.2 of the SFO identified the paragraph's purpose:

> 4.2 Tax Adjustment (AUG 2008)
>
> A. <u>Purpose</u>:
>
> This paragraph provides for adjustment in the rent ("Tax Adjustment") to account for increases or decreases in Real Estate Taxes for the Property after the establishment of the Real Estate Tax

---

[6] The figure $133,045 differs slightly from the $129,788.19 listed in GSA Form 1217. This difference is due to an increase in the amount of rentable square feet GSA leased. (*See* Tr. 437-39 (Winn).) When SAOP submitted Form 1217, it proposed a rentable area of 43,119 rsf. The parties later agreed that GSA would lease slightly more space, and the final agreement reflected in the lease was 44,201 rsf, a difference of 1,082 square feet. (*Id.*; JX 1A.)

Base, as those terms are defined herein. Tax Adjustments shall be calculated in accordance with this Clause.

(JX 1B at 19.)

Paragraph 4.2 also identified definitions relevant to tax adjustment:

> B. <u>Definitions</u>:
>
> The following definitions apply to the use of capitalized terms within this paragraph: . . . .
>
> 2. "Real Estate Taxes" are those taxes that are levied upon the owners of real property by a Taxing Authority (as hereinafter defined) of a State or local Government on an ad valorem basis . . . .
>
> 5. "Tax Abatement" is an authorized reduction in the Lessor's liability for Real Estate Taxes below that determined by applying the generally applicable Real Estate Tax rate to the Fully Assessed (as hereinafter defined) valuation of the Property.
>
> 6. "Unadjusted Real Estate Taxes" are the full amount of Real Estate Taxes that would be assessed for the Property for one full Tax Year without regard to the Lessor's entitlement to any Tax Abatements (except if such Tax Abatement came into effect after the date of award of the Lease) . . . .
>
> 9. "Percentage of Occupancy" refers to that portion of the Property exclusively occupied or used by the Government pursuant to the Lease. For buildings, the Percentage of Occupancy is determined by calculating the ratio of the rentable square feet occupied by the Government pursuant to the Lease to the total rentable square feet in the building . . . .

(*Id.* at 19-20.)

Clause 7 of paragraph 4.2, defining "Real Estate Tax Base," identified the methodology for selecting a real-estate tax base:

> 7. "Real Estate Tax Base" is the Unadjusted Real Estate Taxes for the first full Tax Year following the commencement of the Lease term. If the Real Estate Taxes for that Tax Year are not based upon a Full Assessment of the Property, then *the Real Estate Tax Base shall be the Unadjusted Real Estate Taxes for the Property for the first full Tax Year for which the Real Estate Taxes are based upon a Full Assessment.* Such first full Tax Year may be hereinafter referred to as the "Tax Base Year." *Alternatively, the Real Estate Tax Base may be an amount negotiated by the parties that reflects an agreed upon base for a Fully Assessed value of the property.*

(*Id.* at 20 (emphasis added).)  Clause 7 thus established that the real-estate tax base would be the unadjusted real-estate taxes assessed for the first year following commencement of the lease or, alternatively, would be based on an amount the parties negotiated.

Part C of paragraph 4.2 explained that property taxes would be adjusted to ensure GSA pays only its proportional share of taxes:

> C. Adjustment for Changes in Real Estate Taxes:
>
> > 1. After the Property is Fully Assessed, the Government shall pay its share of any increases and shall receive its share of any decreases in the Real Estate Taxes for the Property, such share of increases or decreases to be referred to herein as "Tax Adjustment."

(*Id.*)

Paragraph 4.2C(1) further specified the methodology for calculating GSA's proportionate tax payment:

> The amount of the Tax Adjustment shall be determined by multiplying the Government's Percentage of Occupancy by the difference between the current year Unadjusted Real Estate Taxes and the Real Estate Tax Base, less the portion of such difference not paid due to a Tax Abatement (except if a Tax Abatement comes into effect after the date of award of the Lease).  If a Tax Abatement comes into effect after the date of award of the Lease, the amount of the Tax Adjustment shall be determined by multiplying the Government's Percentage of Occupancy by the difference between the current year Unadjusted Real Estate Taxes and the Real Estate Tax Base.

(*Id.*)  Paragraph 4.2 was a "standard section" in GSA leases.  (Tr. 433 (Winn).)

Pursuant to the lease, GSA would pay this tax adjustment "in a single annual lump sum payment to the Lessor," and if the adjustment "results in a credit owed to the Government, the Government may elect to receive payment in the form of a rental credit or lump sum payment." (*Id.*)

The overall effect of the real-estate tax provisions was to (1) establish a default and alternative method for selecting the tax base; (2) ensure GSA pays only its share of the building's real-estate taxes based on the percentage of the building it occupies; and (3) identify the appropriate formula to effectuate the tax adjustment.

### D.  Negotiation of the Tax Base

#### 1.  Relevant Tax History

The Northwest Center is in Bexar County, Texas, which assesses the real-estate taxes on the building.  (Tr. 49 (Allen); JX 79.)  Property taxes for a given tax year are payable by January 31 of the following year.  (Tr. 32 (Allen).)  For the 2009 tax year, the year immediately preceding negotiation of the original lease, SAOP was assessed $691,942 in unadjusted real-estate taxes.[7]  (DX 2 at 1.)  For the 2010 tax year, SAOP ultimately paid Bexar County a total of $573,292.86 in real-estate taxes.  (JX 66 at 4; JX 67.)  For the 2011 tax year, SAOP paid a total of $527,585.91 in real-estate taxes.  (JX 66 at 4; JX 67.)  For the 2012 tax year, the first year of taxes after the start of the original lease, SAOP paid $541,020.95 in real-estate taxes.  (JX 78 at 2.)

#### 2.  Lessor's Understanding of the Tax Base

Griffin Partners, the asset- and property-management company that owned SAOP, authorized Mr. Lee Moreland, its senior vice president for asset management, to "sign and negotiate on behalf of Griffin Partners/SAOP Northwest Center, LP" the original lease.  (JX 33.) Mr. Moreland was "the point person in terms of negotiations on behalf of the building owner" and negotiated with GSA the terms of original lease.  (Tr. 130 (Moreland).)

Mr. Moreland submitted Forms 1364 and 1217, as required by the SFO, on behalf of SAOP in January 2010.  (*Id.* at 176, 180.)  His employees prepared the forms under his supervision, and he approved them.  (*Id.* at 181.)  Mr. Moreland's initials appear on each page of SAOP's bid package, including GSA Forms 1364 and 1217, as required, and he signed the last page of both forms.  (DX4; DX 1 at 2; DX 2 at 2.)

Mr. Moreland described GSA Form 1217 as "an estimate that was requested of the annual costs of the building."  (Tr. 184.)  He testified that line 28(a) on Form 1217, which listed the figure $726,629, constituted the "estimated real estate tax expense for the building."  (*Id.* at 185.)  Regarding the origin of the $726,629 figure on line 28(a) of Form 1217, Mr. Moreland testified that it came from one of two places: "It would either have been . . . the budget . . . the year in which [Form 1217] was submitted, which was in January of 2010, or it was based on the year end, December 31, 2009."  (*Id.* at 186.)

Mr. Moreland explained that his "assumption for the reason" he listed the estimated figure of $726,629 in line 28(a) of Form 1217 "was that it was to establish the estimated [expenses] for the building as part of the offer."  (*Id.*)  Mr. Moreland testified that he did not intend for the estimated costs listed on Form 1217 to be reflected in the lease, stating that it "would not have been my intent with the submission of this package."  (*Id.*)  He stated that his only intent with the submission of Form 1217 was to "provide the then current estimate of

---

[7] The unadjusted real-estate taxes are often challenged, and the final real-estate taxes paid on the building do not reflect the initial, unadjusted assessment, as will become evident below.

operating expenses for the building," for the purpose of "completing the SFO as requested by the GSA." (*Id.*) The $726,629 figure of Form 1217 "represents an estimate of what [he] thought that the county would send [SAOP] as a tax bill," though "subject to the protest procedures for assessed values." (*Id.* at 188.)

Mr. Moreland neither agreed to nor negotiated a $726,629 or $133,045 tax base during his discussions with GSA leading to the original lease. (*Id.* at 138, 205.) He testified that the $133,045 figure in paragraph 15 was wrong. (*Id.* at 189.) He agreed that the figure "was a mistake," noting that "the $133,045 was not in keeping with my assumption for setting the base year." (*Id.* at 199.) Ultimately, when asked whether he would "have recommended to SAOP that it adopt a $726,629 . . . real estate tax base for the new lease," Mr. Moreland testified "no." (*Id.* at 146.)

Instead, he intended "to have the tax base be the actual taxes for the year in which the lease commenced." (*Id.* at 139.) He testified that he maintained his intention to use the first-year taxes as the tax base throughout the course of negotiations with GSA. (*Id.*) Given that the lease term began in January 2012, Mr. Moreland testified that he would have intended to use the actual taxes paid in tax year 2012, subject to any subsequent reduction by Bexar County, as the tax base for paragraph 15 of the lease. (*Id.* at 205-06, 209-10.)

### 3. GSA's Understanding of the Tax Base

Ms. Kelly Winn, a real-estate broker for Studley, Inc., served as GSA's representative and broker for the procurement that led to the original lease. (Tr. 415 (Winn).) Ms. Winn had extensive experience with public-sector leases. (*Id.* at 408.) She testified as to the government's intent in formulating the tax-adjustment clause.

Ms. Winn explained that in public-sector leasing, the lessor and the government negotiate using the government's form. (*Id.* at 410.) As set forth in paragraph 3.4 of the SFO, offerors were required to submit GSA Forms 1217 and 1364 with their offer in response to the SFO. (*Id.* at 422-23.) Ms. Winn explained that the "building shell rental rate" referenced in paragraph 3.4(A)(2)(c) of the SFO is comprised of two components. "One is outlined in Section 1.11 of the solicitation for offers, it's the physical components of the space. And then the second component is a monetary component that is taken from another form, 1217, which includes real estate taxes . . . ." (*Id.* at 423.) Ms. Winn confirmed that Forms 1217 and 1364 "are not attached to the lease. These documents make up the business terms for the lease." (*Id.* at 426.) Forms 1217 and 1364 are "the base for the business points of the lease that's negotiated." (*Id.* at 431.)

Ms. Winn explained that line 28 of GSA Form 1217 depicted the lessor's annual operating costs for real-estate taxes. She noted that column (a), which showed a figure of $726,629, represented "the real estate taxes for the entire building," and that column (b), listing the figure $129,788.19, referred to "the proportionate share of the real estate taxes for the government." (*Id.* at 429.) She further explained that "the real estate taxes would have matched up with a real estate tax statement from Bexar County. So . . . it would be either an estimate based on what they had received from the county or it would be the actual just depending on

when it was submitted." (*Id.*) In this case, Ms. Winn identified the figures at line 28 as the estimated costs. (*Id.*)

GSA maintains that it already pays real-estate taxes as part of its shell rent. (*Id.* at 423.) Ms. Winn explained that the shell rental rate "does include the real estate taxes for the building." (*Id.*) The formula referenced in paragraph 15 of the lease is intended to adjust the proportional amount GSA pays when taxes assessed against the building are either more or less than the established tax base. (*Id.* at 434.) Ms. Winn explained that essentially, "the tax base is a reference point pursuant to which the taxes are adjusted." (*Id.*) The tax-adjustment provision seeks to modify what GSA has already paid in its shell rent, and GSA's annual tax payment "could go up, [or] could go down" beyond what had already been paid in the shell rent depending on whether the yearly assessment by the county falls above or below the established tax base. (*Id.*)

Regarding the establishment of a real-estate tax base, Ms. Winn testified that, for all GSA leases, there generally are "two ways that the real estate base could be determined. It can be determined based on after the first year of occupancy, when the government has taken possession of the space, or it can be a determined amount based on -- if I'm a tenant in the building, what the current real estate taxes are." (*Id.* at 435.) For the tax base at issue in this case, she explained: "In this lease, it was a determined amount because we were currently a tenant in the building. So there was a basis for understanding what the real estate taxes were." (*Id.*)

Ms. Winn identified the $726,629 figure from line 28 of GSA Form 1217 as the correct determined amount for the building. *Id.* at 436. When asked whether $133,045 was the tax base as determined and used in paragraph 4.2, she testified "no . . . it should be the real estate taxes for the entire building, $726,629." (*Id.* at 440.) She did not know how the $133,045 figure ended up in paragraph 15 of the lease. (*Id.* at 442.) She testified, as did Mr. Moreland, that the $133,045 number "is a mistake." (*Id.* at 439.)

Ms. Harter, the GSA contracting officer, testified at trial that the proper formula for calculating GSA's proportional share of property taxes is to "take the tax assessment for that year, subtract the tax or the base that's already in our shell rent, and then you take that figure and multiply it by our percentage occupancy, and that is . . . the government's obligation." (Tr. 355 (Harter).) She also explained that the tax base of paragraph 15 was incorrect: "it should have been, instead of the $133,045, in paragraph 15, it should have been the $726,629, because that is the base tax amount for the premises, for the entire building." (*Id.* at 357.)

### E. Tax Payment under Original Lease Between SAOP and GSA

The first tax year after the original lease commenced was tax year 2012. For tax year 2012, SAOP paid $541,020.95 in property taxes to Bexar County for the entire building. (JX 78 at 2.)

Because the real-estate tax base in paragraph 15 of the lease was written as $133,045 and the taxes assessed exceeded $133,045, SAOP determined that it required additional payment from GSA. In a letter dated January 29, 2013, SAOP notified GSA that it was responsible for an

additional $37,348.98, representing one-half of the government's pro rata share of the 2012 taxes. (JX 40 at 6.)

Ms. Harter approved payment of SAOP's bill for a further contribution by GSA to cover the building's 2012 property tax. (JX 41; Tr. 339 (Harter).) She testified that SAOP submitted to GSA with its payment request a worksheet, tax statement, and proof of payment that GSA used to complete an independent tax escalation analysis worksheet. (Tr. at 340.) Ms. Harter relied on this worksheet to approve payment of SAOP's tax bill and testified that she did not consult the lease to approve the request. (*Id.* at 339-40.) GSA therefore issued to SAOP a payment of $37,348.16, representing GSA's portion of a "split payment," on March 1, 2013.[8] (JX 41.)

## F.    Westdale's Purchase of the Northwest Center

Westdale purchased the Northwest Center from SAOP in 2013. Prior to closing on the purchase, on March 24, 2013, Ms. Harter sent Westdale a letter on behalf of GSA pertaining to the lease. The letter confirmed that "1. Lease GS-07B-16737 is currently in full force and effect. 2. No rental has been paid in advance under the leases. 3. No notices of default have been issued by the Contracting Officer." (JX 35 at 1.) The letter based its statements "on a reasonably diligent review of the Contracting Officer's lease files as of the date of issuance of this letter." (*Id.*)

In addition to the letter from GSA, SAOP provided to Westdale, at the time of closing on May 21, 2013, a partial seller-estoppel certificate related to its lease of space to GSA. (JX 36.) The estoppel certificate confirmed that pursuant to the Agreement of Purchase and Sale of March 5, 2013, between Westdale and SAOP, "the owner of the Property and the landlord's interest in the Lease [SAOP], intends to sell, transfer, assign and convey such Property, and the landlord's interest in all tenant leases with respect to such property." (*Id.* at 1.) The estoppel certificate also confirmed that "Tenant is currently obligated to pay fixed or base rent under the Lease in the annual amount of $1,046,237.67" in monthly installments. (*Id.*) It established that there were "no concession, bonuses, free months' rental, rebates or other matters affecting the rental for Tenant which Tenant has not received" and that "[t]o the best of Seller's knowledge, there are no events or conditions existing which, with or without notice or the lapse of time, or both, could constitute a monetary or other default of the landlord or tenant under the Lease . . . ." (*Id.*)

Mr. Allen, Westdale's executive vice president, negotiated the purchase of Northwest Center and completed the due diligence. (Tr. at 35 (Allen).) He testified that he relied on GSA's representation that its lease was in full force and effect. (*Id.* at 40.) He maintained that the government's estoppel certificate is "critical" because the new lessor had not "had any relationship with the tenants" prior to purchase. (*Id.*) He received similar representations from the seller, Griffin Partners. (*Id.* at 41; JX 36.) Mr. Allen had been involved with prior

---

[8] The difference between SAOP's request of $37,348.98 and GSA's payment of $37,348.16 reflects a rounding issue that the plaintiff does not dispute.

acquisitions from Griffin Partners in Houston. (Tr. 34-35.) He noted that the seller's estoppel certificate serves to confirm that there are "no outstanding issues that a buyer would need to be aware [of]." (*Id.* at 38.)

Because the contracting parties to the original lease, SAOP and GSA, were unaware of the alleged mistake in paragraph 15, Westdale did not know prior to the purchase that there was any mistake written into the terms of the lease. (*Id.* at 53.) The amount of GSA's rental payments aligned with the market rate for office space in San Antonio. (Tr. 140-41 (Moreland).)

Mr. Allen explained that Westdale's intention in buying the Northwest Center related to potential rental income from tenants in the building. In buying an office building, Mr. Allen testified, the buyer is "buying an income stream. . . . [B]asically how our industry values the building is based on the income stream that you anticipate receiving over typically a three to five-year period, or longer in our case." (Tr. 36 (Allen).) He explained that GSA's occupancy "represented 20 percent of the building. There's no way we were buying the building that didn't include this rental stream. No way, no how." (*Id.* at 98-99.)

Mr. Allen testified that the government's reading of the lease as intending other than a $133,045 tax base "reduces the rental rate [Westdale] otherwise anticipated receiving." (*Id.* at 77.) The withholding of rent payments by GSA to account for the mistake in the tax base reflected in the original lease creates "a reduction in the cash flow that we anticipated. You know, we bought a number of leases in place, the GSA lease was one of many leases that we bought at this property, and we have not received the income that we projected based on the clear reading of the lease that we anticipated to receive." (*Id.* at 77-78.) Therefore, Mr. Allen maintained that Westdale is not receiving the benefit of its bargain under the lease that it assumed with the government "based on [Westdale's] clear reading of the lease document." (*Id.* at 77.)

On May 21, 2013, by a special warranty deed executed by SAOP, Westdale took title to the real property and improvements. (Jt. Stip. ¶ 12.) All lease files for each tenant in the building were transferred to Westdale at the time of purchase. (Tr. 135 (Moreland).)

After closing on the property, Westdale, SAOP, and GSA entered into Lease Agreement No. 13, effective July 16, 2013. (JX 14; Jt. Stip. ¶ 13.) This agreement memorialized Westdale's assumption of all obligations and liabilities of SAOP under the original lease, as amended, and Westdale became the lessor for the remainder of the term of the original lease:

> Westdale Northwest Center, LP, Lessor, hereby assumes all the incomplete obligations of Lease GS-07B-16737 as amended, and agrees to perform same in accordance with the terms, conditions, and provisions thereof from and after July 16, 2013. Lessor further assumes all obligations and liabilities of and all claims and demands arising under Lease GS-07B-16737 against [SAOP] and ratifies and confirms all actions heretofore taken by [SAOP] with respect to the contract with the same force and effect as if the actions had been taken by [Westdale]. Nothing contained herein shall be construed

as releasing [SAOP] from [SAOP's] obligations under the terms of
the lease.

(JX 14 at 1.)

Paragraph 6 of Lease Agreement No. 13 discharged any further payment obligation by
GSA to SAOP:

> Notwithstanding the foregoing, all payments heretofore made by the
> Government to [SAOP] and all other actions hereto taken by the
> Government pursuant to its obligations under the contract shall be
> deemed to have discharged the Government's obligations under the
> contract to the extent of the amounts so paid or reimbursed or such
> actions taken.

(*Id.*)

### G.    Contract Performance Under Lease Between Westdale and GSA

#### 1.    Tax Year 2013

On July 5, 2014, Westdale sent GSA a letter pertaining to taxes owed for tax year 2013.
Westdale notified GSA that it owed $86,446.84, representing GSA's pro rata share in excess of
the established real-estate tax base of the 2013 real-estate taxes assessed against the building.
(Jt. Stip. ¶ 15.)  Westdale submitted with its letter a worksheet, tax statement, and proof of
payment.  In response to Westdale's letter, Ms. Harter's supervisor at GSA, Mr. Ed Perez,
approved payment of the 2013 real-estate taxes as determined by the tax-adjustment clause of the
lease.  (JX 43; Tr. 340-41 (Harter).)  GSA paid the sum of $86,446.34, a difference of $.50 from
Westdale's request that the parties do not dispute.  (JX 43.)

#### 2.    Government Audit

On November 4, 2014, GSA provided notice to Westdale by letter that GSA had
conducted an audit of the lease and the rental payments it had made.  (JX 58.)  GSA's "review of
the lease and rental payments revealed that [Westdale had] been overpaid in the amount of
$79,027.78."  (*Id.* at 1.)  The letter notified Westdale that the overpayment would be deducted
from shell rent payments for two months until repaid in full.  (*Id.*)

GSA's audit pertained to tax-adjustment payments due under the lease for 2012 and from
January 1 to May 20, 2013.  (Jt. Stip. ¶ 16.)  A "rate sheet" used in the audit, titled "Yearly
Stepped Rent Levelizer" was attached to GSA's November 4 letter and included a handwritten
notation at the top providing that this document was "not part of their lease."  (JX 58 at 7.)

GSA's November 4, 2014 letter was the first indication Westdale received that GSA
believed it had overpaid property taxes under the lease, including when the Northwest Center
had been under SAOP's ownership.  (Tr. 61 (Allen).)  On November 5, 2014, Westdale
responded via letter to GSA's claims and contended that GSA had been correctly invoiced

according to the tax adjustment provision in the lease. (JX 59.) Westdale explained that "according to Paragraph 15 of the lease, the base amount is $133,045.00 with a percentage of occupancy of 18.309894% . . . . Based on the attached invoices, it is the Landlord's opinion that it has correctly invoiced the Government per the terms of the lease." (*Id.*)

By letter dated November 7, 2014, GSA notified Westdale that its audit also concluded that Westdale had been overpaid in the amount of $13,630.21 for property taxes due from May 21 to December 31, 2013. (Jt. Stip. ¶ 18.)

On January 16, 2015, GSA issued a letter to Griffin Partners, the former asset management company, demanding the return of $79,027.78, asserting an erroneous overpayment made under the terms of the original lease. GSA deducted this amount from payments of rent and other charges due to Westdale. (Jt. Stip. ¶ 19.)

### 3. Occupancy Increase

On February 16, 2015, Westdale and GSA executed Lease Amendment No. 17, effective retroactively from December 18, 2014, documenting GSA's acceptance of 3,417 additional rsf of recently constructed expansion space. (Jt. Stip. ¶ 20; JX 18 at 1.) The new space increased the space GSA occupied to 47,618 rsf or 19.725357 percent of the building. (Jt. Stip. ¶ 21; JX 18 at 1.) For the purposes of this dispute, GSA's occupancy remains 19.725357 percent to date. [9] (Jt. Stip. ¶ 21.)

Paragraph D of Lease Amendment No. 17 provided that "Paragraph 15 of the Lease is hereby amended as follows. . . . 15. In accordance with the SFO Paragraph 4.2 entitled 'Tax Adjustment,' this lease is subject to real estate tax adjustment. The base amount is established as $133,045.00. The percentage of occupancy is 19.725357% [47,618 RSF/241,405 RSF]." (JX 18 at 2 (brackets in original).) Ms. Harter testified that the retention of the figure $133,045 in paragraph D of Lease Amendment No. 17 was another mistake. (Tr. 390 (Harter).)

### 4. 2014 Tax Year

On March 31, 2015, Westdale notified GSA via email that GSA was responsible for paying its pro rata share of the 2014 real-estate taxes assessed against the property above the established base-year amount. (Jt. Stip. ¶ 22.) Westdale invoiced GSA $105,341.85. (*Id.*) On June 27, 2015, GSA notified Westdale that GSA had overpaid its share of 2014 real estate taxes by $27,391.00. GSA notified Westdale of its intention to deduct that amount from future rental

---

[9] GSA later increased its occupancy to 23.277479 percent of the building through Lease Amendment No. 19, effective March 1, 2017, but the additional space leased by GSA is subject to its own separate property-tax base. (Jt. Stip. ¶ 21; JX 20.) Paragraph 5 of the lease amendment provides: "The Base Cost of Services for the expansion area in 2017 is established at $8.30 per rental sq. ft. The Tax Base for the Expansion Area is included in the shell rent and shall be the taxes for 2017." (JX 20 at 3.) The newly occupied space thus used the first year of taxes under the lease amendment for the tax base.

payments. (*Id.* at ¶ 23.) In August 2015, GSA withheld $27,391.00 from its rent payment. (*Id.* at ¶ 24.)

On August 28, 2015, Ms. Harter sent Westdale a letter on behalf of GSA in response to Westdale's claim, explaining the erroneous tax base:

> I have conducted a thorough examination of the lease and tax audit documents, along with the Lessor's Annual Cost Statement which was submitted with the Lessor's offer for the succeeding lease, and tax records for the building. In doing so, I have determined the lease language itself does not correctly represent the intention of the established real estate tax base as it relates to real estate adjustments. Paragraph 15 of the SF2 and Lease Amendment (LA) No. 17 do state the base amount is established as $133,045.00 which I believe is intended to be the tax base for the **Government occupied** percentage of the building only, not the entire building.

(JX 26 at 4 (emphasis in original).) Due to a subsequent reduction by Bexar County of Westdale's total property-tax obligations, Westdale received a refund of $56,145.16, reducing the amount Westdale claims is due for 2014 taxes to $95,061.73. (Jt. Stip. ¶ 24.)

Ms. Harter attached Lease Amendment No. 18 to her August 2015 letter "to clarify the intention of the $133,045.00 tax base." (JX 26 at 5, 11.) Lease Amendment No. 18 sought to replace the tax base of $133,045 written into paragraph 15 of the lease with $726,629. (*Id.*) Westdale did not sign Lease Amendment No. 18.

### 5.    Subsequent Tax Years[10]

For the 2015 tax year, Westdale invoiced GSA for $130,672.02, representing GSA's proportional share of real-estate taxes. (Jt. Stip. ¶ 25; JX 47.) GSA prepared a tax escalation worksheet and determined it owed $23,870.61. (JX 49.) It paid the sum of $23,870.61, leaving $106,801.41 of the amount Westdale had invoiced. (Jt. Stip. ¶ 25.) Westdale later received a reduction in real-estate taxes owed to Bexar County, resulting in a refund to Westdale of $59,647.11 for the 2015 tax year. (*Id.*) This reduction decreased the total 2015 taxes allegedly owed by GSA from $130,672.02 to $118,906.41 and decreases the amount Westdale alleges to be still due from GSA from $106,801.41 to $95,035.80.

For the 2016 tax year, Westdale invoiced GSA for $127,913.93. (*Id.* ¶ 28; JX 51.) Of the total amount invoiced, GSA paid $21,112.52, leaving $106,801.41 as an alleged remaining balance. (Jt. Stip. ¶ 28; JX 52; JX 53.) Due to a subsequent tax reduction by Bexar County,

---

[10] The Court has reached slightly different mathematical calculations in determining the amounts the plaintiff alleges to be due from GSA. These discrepancies are a matter of a few cents. For the purposes of this opinion, the Court adopts the amount due as alleged by the plaintiff and as is reflected in the parties' joint stipulation of facts.

Westdale received a $30,991.27 refund on its 2016 taxes. This reduction decreased the total 2016 taxes allegedly due from GSA from $127,913.13 to $121,800.78 and decreases the amount Westdale alleges to be still due from GSA from $106,801.41 to $100,688.26. (Jt. Stip. ¶ 28.)

For the 2017 tax year, Westdale invoiced GSA for $133,365.35. (JX 54 at 3.) GSA paid $26,563.96 of that total, leaving $106,801.39 that Westdale alleges is still due. (Jt. Stip. ¶ 30; JX 54A; JX 54B.) Westdale again received a refund of its 2017 taxes, decreasing the taxes allegedly due from GSA from $133,365.35 to $127,808.93, and decreasing the amount Westdale now alleges to be still due from GSA from $106,801.41 to $101,244.97.

For the 2018 tax year, Westdale invoiced GSA for $132,988.83. (Jt. Stip. ¶ 32.) GSA paid $54,861.85, leaving $78,126.78 alleged to be due to Westdale. (*Id.*) A subsequent reduction by Bexar County to the assessed value of the building resulted in a refund of $21,564.46 of the taxes Westdale paid for the 2018 tax year. (*Id.*) This reduction decreases the total 2018 taxes allegedly due from GSA from $132,988.83 to $128,735.17 and decreases the amount Westdale alleges to be still due from GSA from $78,126.78 to $73,873.32.

For the 2019 tax year, Westdale invoiced GSA for $129,990.55. (Jt. Stip. ¶ 34.) GSA paid the sum of $22,581.42 and was due a credit in the amount of $607.74 relating to its expansion space on the ninth floor of the building, leaving the sum of $107,409.13 alleged to be due to Westdale. (*Id.*) A subsequent reduction by Bexar County to the assessed value of the building resulted in a refund of $27,014.34 of the taxes Westdale paid for the 2019 tax year. (*Id.*) This reduction decreases the 2019 taxes allegedly due from GSA from $129,990.55 to $124,661.88 and decreases the amount Westdale now alleges to be still due from GSA from $107,409.13 to $101,472.72.

For the 2020 tax year, Westdale was assessed $788,235.87 in property taxes by Bexar County. (JX 80.)

In sum, Westdale asserts that its damages are based on the alleged unpaid taxes:

| Tax Year | Westdale Billed GSA | GSA Paid | Allegedly Due to Westdale (Adjusted) |
|---|---|---|---|
| 2014 | $ 105,341.85 | $ 0 | $ 95,061.73 |
| 2015 | 130,672.02 | 23,870.61 | 95,035.80 |
| 2016 | 127,913.93 | 21,112.52 | 100,688.26 |
| 2017 | 133,365.35 | 26,563.96 | 101,244.97 |
| 2018 | 132,988.83 | 54,861.85 | 73,873.32 |
| 2019 | 129,990.55 | 23,189.16 | 101,472.72 |
| UNPAID TAXES: $567,376.80 | | | |

(ECF 139 at 28.)

## H.    Certified Claims

Westdale has presented four claims to Ms. Harter, GSA's contracting officer, for payment of sums it views as due under the plain text of the lease.[11] (Jt. Stip. ¶¶ 27-38.)

On July 10, 2015, Westdale presented its first certified claim to Ms. Harter for $197,828.56, representing rent and tax adjustments allegedly due to date. (*Id.* ¶ 26.) Westdale requested a final decision. (*Id.*) On October 27, 2015, Ms. Harter issued a final decision denying Westdale's claim.[12] (*Id.* at ¶ 27.)

On December 20, 2017, Westdale presented a second certified claim to the contracting officer. (*Id.* ¶ 31.) Westdale sought declaratory relief related to construction and breach of the lease and equitable adjustment. Westdale requested a final decision. The contracting officer denied Westdale's second certified claim in a final decision on February 8, 2018. (*Id.* ¶ 33.)

On October 22, 2019, Westdale presented its third certified claim for sums it alleges are due under the terms of the lease for tax years 2014 through 2018. (*Id.* ¶ 35.) The contracting officer issued a final decision on November 14, 2019, denying the third certified claim. (*Id.* ¶ 36.)

On November 17, 2020, Westdale presented its fourth certified claim to the contracting officer for sums it views as due for tax year 2019. (*Id.* ¶ 37.) On November 23, 2020, the contracting officer denied the fourth certified claim in a final decision. (*Id.* ¶ 38.)

---

[11] In its second certified claim presented to the contracting officer, Westdale sought enforcement of the lease as written or, "[i]n the alternative, an equitable adjustment or reformation of paragraph 15 of the Lease to reflect that the real estate tax base for real estate taxes is the actual real estate taxes paid for tax year 2012 on the 'Property.'" (JX 27 at 4.) Westdale's second, third, and fourth certified claims before the contracting officer also incorporated by reference the complaint in this lawsuit and included the complaint as an attachment. Like the certified claims, the complaint sought, in the alternative, reformation of paragraph 15 of the lease. (JX 27 at 1; JX 29 at 1; JX 31 at 1.) The plaintiff thus raised the issue of reformation in its claims before the contracting officer and requested and received a final decision on these claims. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327-29 (Fed. Cir. 2010) (premising the Court of Federal Claims' jurisdiction over a CDA case on whether the claim was timely, provided notice of the basis and amount of the claim, and was subject to a contracting officer's final decision).

[12] Although the contracting officer denied the majority of Westdale's claim, GSA determined it did owe Westdale $28.42 based on its audit of its rental payments under the lease. (JX 26 at 1.)

# I.    Procedural History

The plaintiff filed a five-count complaint on January 27, 2016.[13]  (ECF 1.)  The defendant filed a motion to dismiss in lieu of an answer on May 4, 2016.  (ECF 9.)  The defendant's initial motion to dismiss was denied on January 11, 2017.  (ECF 28.)  The parties then attempted alternative dispute resolution, but that proved unfruitful.  After the completion of discovery, the defendant moved for summary judgment and the plaintiff cross-moved for partial summary judgment.  Those motions were denied on May 1, 2019.  In rejecting both parties' motions, Senior Judge Smith found that "genuine issues of material fact remain regarding the intent of the parties at the time of contracting."  (ECF 62.)  The case was transferred to the undersigned in June 2019.  With leave of the Court, the plaintiff thereafter filed an amended four-count complaint.  (ECF 70.)  Count IV of the plaintiff's first amended complaint realleged a claim for reformation in the event a mutual mistake was found.  (*Id.* ¶ 53.)  The defendant's answer to the first amended complaint raised mutual mistake as an affirmative defense.  (ECF 77.)

The Court held a three-day trial in this case in Washington, DC, from January 25 through January 27, 2021.[14]  The parties filed post-trial briefs and submitted proposed findings of fact and conclusions of law.  The Court heard closing argument on April 30, 2021.

# II.    JURISDICTION

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  This court thus has jurisdiction over claims for breach of contract founded upon an express contract with the United States.  *Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996) (noting that the Tucker Act confers upon this court jurisdiction to hear cases founded upon express contracts with the United States).

---

[13] Count V of the plaintiff's complaint is pleaded in the alternative.  Under Count V, the plaintiff alleged that if the court were to determine that the tax-adjustment clause "is the result of a mutual mistake or scrivener's error, [Westdale] seeks an equitable adjustment or reformation of the lease to replace the $133,045.00 amount with the actual tax base as evidence [sic] by the amount of tax assessed for 2012."  (ECF 1 ¶ 39.)  The defendant also raised a claim of mutual mistake in its motion for summary judgment in response to Count V.  (ECF 55 at 1 n.1.)

[14] At the start of the trial, the Court denied the plaintiff's motion in limine seeking a finding that the lease provisions at issue are unambiguous and the exclusion of any evidence related to mutual mistake or the Anti-Deficiency Act.  (ECF 124.)  The Court permitted the exclusion of information pertaining to the parties' efforts at alternative dispute resolution.  (*Id.*)  The Court denied the plaintiff's motion to strike the testimony of Ms. Kelly Winn.  (ECF 125.)

The Tucker Act also grants this court jurisdiction over claims arising under section 7104(b)(1) of the Contract Disputes Act ("CDA"), 41 U.S.C. § 7100 et seq. 28 U.S.C. § 1491(a)(2). The CDA provides this court with jurisdiction over contract disputes. 41 U.S.C. § 7104(b)(1) ("[A] contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary."); § 7101(7) ("The term 'contractor' means a party to a Federal Government contract other than the Federal Government.").[15]

Although the CDA expressly provides that contracts for "the procurement of . . . real property in being" fall outside its applicability, the "act of entering into a lease" does not fall within that exclusion. *CanPro Inv. Ltd. v. United States*, 120 Fed. Cl. 17, 21 (2015) (citing *Forman v. United States*, 767 F.2d 875, 879 (Fed. Cir. 1985)). The CDA therefore provides this court with jurisdiction over disputes related to leaseholds.[16] *Id.* (citing *Forman*, 767 F.2d at 879). The court's "authority to adjudicate CDA leasehold disputes encompasses the authority to grant nonmonetary relief in appropriate circumstances." *Id.*

To present a claim under the CDA, a contractor must satisfy two requirements. First, the contractor must present a timely written claim to the contracting officer for a decision. 41 U.S.C. § 7103(a); *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1264-65 (Fed. Cir. 1999) (noting additionally that the contractor must "specifically assert entitlement to the relief sought"). Second, the contracting officer must issue a final decision. *Id.* at 1267.

The lease at issue in this case specifically provides that it is subject to the CDA. (JX 1E at 19.) The claims pertain to a newly created leasehold interest, and the plaintiff has satisfied the two CDA requirements. Westdale presented four certified written claims to the contracting officer and all four were denied by the contracting officer in final decisions. Accordingly, the Court has jurisdiction over Westdale's claims under the Tucker Act and the CDA.

---

[15] The Court's power to reform a contract extends to cases arising under the CDA. *See, e.g.*, *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 665 (Fed. Cir. 1992) (considering reformation in a case governed by the CDA); *Lakeshore Eng'g Servs., Inc. v. United States*, 110 Fed. Cl. 230 (2013), *aff'd*, 748 F.3d 1341 (Fed. Cir. 2014) (same).

[16] The Federal Circuit has distinguished between leaseholds that are newly created and those acquired by other means, noting that only newly created leaseholds fall within the CDA's purview. *Forman*, 767 F.2d at 879 ("'Acquisition of' a lease is not the same thing as 'entering into' a lease. . . . A leasehold does not exist until a lease is entered into, and by entering into a lease the Government does not acquire a pre-existing interest in the land; it establishes a new one. Thus, the . . . language excluding contracts to procure 'real property in being' fails to apply to newly-created lease agreements, and they fall within the purview of that statute and of the corresponding provisions of the Contract Disputes Act.").

## III.    DISCUSSION[17]

The Court is tasked with interpreting the tax-adjustment provision of the lease. "Leases are normally considered within the realm of contracts." *Forman*, 767 F.2d at 879 n.4. The lease is thus subject to general principles of contract interpretation as equally applicable to the federal government as they are to a private party. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000) ("'When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (plurality opinion)). While "federal law, rather than state law, governs the interpretation of leases with the United States government," when federal law is not dispositive "courts should look to 'general property and contract law principles as they are embodied in state law pronouncements.'" *See California Oregon Broad., Inc. v. United States*, 74 Fed. Cl. 394, 399 (citing *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986) and quoting *Ginsburg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992)).

The interpretation of a contract is a matter of law. *Ragard v. United States,* 439 F.3d 1378, 1380 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 819 (2006). A court begins its legal analysis with the contract's text, first examining "the plain meaning of its express terms." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (citing *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998)).

Two doctrines of interpretation guide the Court's initial analysis. First, under the "plain meaning" rule, "[i]f the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them." *Id.* (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). A contract provision is ambiguous only "if susceptible to more than one reasonable meaning." *Id.* at 1375-76 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)). Second, under the parol evidence rule, if the parties have adopted a written text as an expression of their final understanding of the agreement between them, a court may not consider extrinsic evidence to add or otherwise modify the terms of the written agreement. *Id.* at 1375.

Under these doctrines, if a court finds a contract to be unambiguous, the plain meaning and parol evidence rules bar consideration of evidence outside the four corners of the contract and require the Court to enforce the contract as written. *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) (en banc) ("When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the [a]greement controls.").

If a contract's terms are ambiguous, a court is afforded latitude in interpreting the contract and may consider extrinsic evidence to assist in understanding and interpreting the agreement. *See TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir.

---

[17] The Court's discussion includes further findings of fact as well as legal conclusions based on the facts as found.

2006) ("When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may then resort to extrinsic evidence to resolve the ambiguity." (internal citation omitted)).

Additionally, the parol evidence rule may be overcome by evidence of "'fraud, duress, mutual mistake, or something of the kind.'" *Nicholson v. United States*, 29 Fed. Cl. 180, 193 (1993) (quoting Williston & Lord, A Treatise on the Law of Contracts § 631 (3d ed. 1961)). In these circumstances, courts may find that even an unambiguous contract will not be enforced as written. A finding of unilateral or mutual mistake, for example, permits a court to consider evidence outside the text of the parties' agreement.

Accordingly, the Court first considers whether the terms of paragraph 15 of the lease are ambiguous. Finding that the terms are unambiguous, the Court next determines whether the parties committed a mutual mistake in drafting the lease and, if so, whether reformation of the lease to conform to the intent of the original contracting parties is appropriate.

## A.    Ambiguity

The Court begins its analysis by considering whether the tax-adjustment provision in paragraph 15 of the lease is ambiguous.

### 1.    Parties' Arguments

Westdale argues that "none of the provisions in the Lease relating to real estate tax adjustment are ambiguous." (ECF 139 at 31.) The plain text of the lease establishes in paragraph 15 a tax base of $133,045. (JX 1A at 3.) That figure is not ambiguous—the lease establishes a specific tax base, and the number $133,045 is subject to but a single interpretation. The government was tasked with preparing a lease that incorporated the agreement of the parties and drafted the original lease. (JX 1B at 13.) Westdale argues that, based on the plain text of the lease, the Court should find the lease to be unambiguous and, under the parol evidence rule, should exclude all evidence outside the four corners of the lease and the documents it incorporates.

GSA argues that the lease must be reformed because the terms are ambiguous. It argues that the law of the case establishes ambiguity. In denying the parties' cross-motions for summary judgment, Senior Judge Smith held that "genuine issues of fact remain regarding the intent of the parties at the time of contracting." (ECF 62.) According to the defendant, this earlier conclusion establishes that the lease is ambiguous. The defendant also cites two general principles of contract interpretation to argue that the lease is ambiguous.

First, the defendant points to the law of patent ambiguity. "'[A] contract is subject to a patent ambiguity if it contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.'" *Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 (1997) (quoting *Nielsen-Gillingham Builders, J.V. v. United States*, 43 Fed. Cl. 5, 11 (1999)). "When a federal government contract contains a patent ambiguity[,] that is, one which is so plain or

glaring that it is unreasonable for a contractor not to discover and inquire about it, the patent ambiguity doctrine imposes a duty on the contractor to inquire about the true meaning of the ambiguity before submitting a bid [, and] a failure to do so results in the ambiguity being construed against the contractor." 13 A.L.R. Fed. 2d 261 (2006). The defendant thus argues that the Court should construe the lease against Griffin Partners and, by extension, Westdale, for failure to discover the patent ambiguity.

Second, the defendant raises the issue of latent ambiguity. A contract may be considered latently ambiguous if it is "'reasonably susceptible of more than one interpretation.'" *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992) (quoting *Edward R. Marden Corp.*, 803 F.2d at 705). "An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practice, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2009) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).

## 2. The Lease is Unambiguous

Paragraph 15 of the lease is unambiguous as written. The law of the case does not establish ambiguity in the lease. In denying the parties' cross-motions for summary judgment, Senior Judge Smith entered a short order in which he noted that "genuine issues of material fact remain regarding the intent of the parties at the time of contracting." (ECF 62.) That order includes no findings about the merits of the case or the ambiguity of the lease's tax-adjustment provision. The law of the case doctrine "comes into play only with respect to issues previously determined." *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979) (citation omitted). While Senior Judge Smith's finding may be read to suggest that the court would entertain testimony outside the four corners of the lease to determine the parties' intent, the defendant reads too much into the order denying summary judgment. Indeed, implicit in the denial of summary judgment is the need for additional evidence to ascertain whether the parties had committed a mutual mistake, which is an exception to the parol evidence rule that does not require the contract to be ambiguous. No explicit finding of ambiguity was made in this case, and the Court therefore rejects the defendant's argument that the law of the case precludes a finding that the lease is unambiguous.

The tax base is not the subject of patent ambiguity. The defendant's effort to shift blame to the plaintiff through the patent-ambiguity doctrine fails in the face of at least three errors the defendant itself made.

First, GSA drafted the lease incorrectly by including an erroneous tax base. If the Court were to find the contract ambiguous, the duty would remain with GSA, as the drafter, to have included an accurate tax base in paragraph 15. *See HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("The general rule is *contra proferentem*, which requires ambiguities in a document to be resolved against the drafter." (citing *Hills Materials Co.*, 982 F.2d at 516)). In this case, a properly drafted paragraph 15 would have reflected either a negotiated amount or the actual real-estate taxes paid by the lessor for the first tax year after the commencement of the

lease. (JX 1B at 19.) While the plaintiff did not notice the incorrect tax base before executing the lease, SAOP is less blame-worthy for its careless proofreading than GSA, as the drafter. The plaintiff itself, of course, was not involved in the drafting of the lease and can bear no responsibility for the erroneously drafted provision.

Second, GSA paid both SAOP in 2012 and Westdale in 2013 according to the terms of the lease as written. (JX 41 & 43.) GSA had the opportunity to discover the alleged patent ambiguity in calculating its yearly tax payment to the lessor, but it did not for at least the first two years of the lease.

Third, GSA increased its percentage of occupancy in the building yet failed to adjust paragraph 15 of the lease to correct the tax base, repeating its error in Lease Amendment No. 17. (JX 18; Tr. 390 (Harter).)

These three instances in which GSA did not discover the alleged ambiguity show that the erroneous term in the lease was not so "glaring" or obvious that the lessor should have caught it; GSA itself failed to do so on at least three occasions. The Court will not fault the lessor for the error GSA made in multiple instances that could have been caught through accurate drafting and careful proofreading.

The defendant's argument that the lease is latently ambiguous is also without merit. The figure $133,045 written into paragraph 15 of the lease is not "reasonably susceptible of more than one interpretation." *Hill Materials*, 982 F.2d at 516. The figure itself requires no interpretation; it establishes a clear tax base and is incorporated into a formula for adjusting GSA's yearly real-estate tax payment beyond what is already paid in the shell rent. The parties do not dispute the proper methodology for calculating the annual tax payment. What is in dispute is solely the tax base, and that number, though evidently wrong, may be interpreted in only one manner.

The Court finds that paragraph 15 of the lease, setting a tax base for purposes of adjusting GSA's yearly real-estate tax payment, is unambiguous. In most instances, "[i]f the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them." *Barron Bancshares*, 366 F.3d at 1375; 11 Williston on Contracts § 33:42 (4th ed. 2021) ("If there is no ambiguity in the agreement itself, the answer must be found from the terms of the instrument alone.").

Any further inquiry into the parties' intent would therefore normally be barred by the finding that the contract is unambiguous. In this instance, however, GSA has raised the issue of mutual mistake. If a party seeks reformation based on an alleged mistake, the parol evidence rule does not apply. 11 Williston on Contracts § 33:2 (4th ed. 2021). Under this exception, the Court may consider extrinsic evidence even when faced with a binding, unambiguous written contract to correct the parties' mistake. *Id.*

The Court next considers whether the $133,045 tax base written into paragraph 15 of the lease was the product of a mutual mistake by the parties.

### B.    Mutual Mistake[18]

Rather than alleging a unilateral mistake, the defendant seeks reformation of the lease due to mutual mistake.  (ECF 137 at 20.)  The Court considers first whether the facts of this case support a finding of mutual mistake.  Finding that the erroneous tax base written into paragraph 15 of the lease is the product of mutual mistake, the Court then considers whether reformation for mutual mistake is an appropriate remedy.

### 1.    Evidence of Mistake

The Restatement (Second) of Contracts § 155, titled "When Mistake of Both Parties as to Written Expression Justifies Reformation," explains when a court may reform a contract due to mutual mistake:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Restatement (Second) of Contracts § 155.  Several requirements arise from the decisions reflected by the Restatement's summary of the rule governing mutual mistake.

First, as is obvious, the parties must have committed a mistake.  Here, multiple witnesses testified at trial that the $133,045 figure written into paragraph 15 of the lease was a mistake. (*See* Tr. 189 (Moreland), 357 (Harter), & 439 (Winn).)  The evidence establishes that the tax base set forth in the lease was not a figure either contracting party intended.

Second, for the court to reform an instrument due to mutual mistake, the parties must have reached an agreement on the issue for which reformation is sought that was not reflected in the final written document.  "[R]eformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. . . .  For the rule stated in this Section to be invoked, therefore, there must have been some agreement between the parties prior to the writing."  Restatement (Second) of Contracts § 155 cmt. a.  Prior agreement is central to a finding of mutual mistake: "'[reformation] is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed.'"  *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 811 (1990) (quoting 3 Corbin on Contracts § 614 at 723 (1960)).  Because of this requirement of prior agreement, reformation is available only when the party seeking the reformation can show that the non-moving party "would have agreed to the contract if worded in

---

[18] The plaintiff argues that any relief pursuant to the doctrine of unilateral mistake is unavailable to GSA.  Because the defendant has not claimed a unilateral mistake, the Court does not consider the question of unilateral mistake.

accordance with the [moving party's] intention." *Fraass Surgical Mfg. Co., Inc. v. United States*, 571 F.2d 34, 37 (Ct. Cl. 1978).

The parties in this case came to an agreement prior to signing the lease regarding the methodology for adjusting the yearly real-estate taxes to be paid by GSA. The parties agreed that GSA would pay a portion of its real-estate taxes in its monthly shell rent. The parties also agreed to adjust GSA's real-estate tax payments based on whether the amount the lessor paid in real-estate taxes in any given year fell above or below an established tax base. Most importantly, the parties agreed that the tax base would be one of two numbers. Paragraph 4.2 of the SFO, referenced in paragraph 15 of the lease, defined the "Real Estate Tax Base" as "the Unadjusted Real Estate Taxes for the first full Tax Year following the commencement of the Lease term," or "[a]lternatively, the Real Estate Tax Base may be an amount negotiated by the parties that reflects an agreed upon base for a Fully Assessed value of the property." (JX 1B at 19.) Thus, paragraph 4.2 established a tax base of either an amount negotiated by the parties or the unadjusted real-estate taxes paid by the lessor for the entire building for the tax year in which the lease began ("first-year taxes").

The methodology described in paragraph 4.2 of the SFO demonstrates that the parties agreed on how to compute a tax base even if not on the precise tax base itself; in essence, the parties reached a shared understanding on the methodology behind selecting a tax base and narrowed the range of possible tax bases to two discrete options. The parties' agreement to use either a negotiated amount or the first-year taxes was not, however, reflected in the lease, because the figure $133,045 does not correspond to either agreed-upon source for the tax base. The parties mistakenly failed to write into paragraph 15 a tax base that conformed to their chosen methodology.

Ultimately, a court looks to the "objective circumstances surrounding execution of the contract," not subjective intent, to ascertain whether the parties held a belief not in accord with the facts. 27 Williston on Contracts § 70.13 (4th ed.). Regardless of each party's subjective intent, the parties in this case established objective criteria for establishing the tax base, but the criteria were not used in writing the tax base into the lease. The parties were thus mutually mistaken in each of their respective beliefs that the lease they signed—containing a $133,045 tax base—would accomplish their shared goal of ensuring GSA pays only its proportional share of the building's real-estate taxes.

## 2.    Good-Faith Purchaser

Westdale argues that the lease cannot be reformed against a good-faith purchaser for value. It argues that "there was no evidence at trial that Westdale was anything other than a good faith purchaser for value, with no notice of any 'mistake' affecting the considerations to be paid under the Lease," and that "[t]he reformation the Government requests" is thus "not available against Westdale." (ECF 138 at 18.)

A good-faith (or "bona fide") purchaser "is one who purchases legal title to property in good faith for valuable consideration, without notice of any other claim of interest in the property." *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1329 (Fed. Cir.

2002) (citations omitted), *cert denied sub nom. Monsanto Co. v. Bayer CropScience, S.A.*, 593 U.S. 957 (2003); *see also Boon v. Chiles*, 35 U.S. (10 Pet.) 177, 210 (1836) (explaining that an innocent purchaser "has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it").

Westdale meets the definition of a good-faith purchaser for value. Westdale purchased Northwest Center in 2013 by special warranty deed. Jt. Stip. ¶ 12. Westdale's purchase included the leases in the building. *Id.* ¶ 13. Westdale bought the building intending to obtain an income-stream from the commercial-office leases in place and was unaware of any dispute over the real-estate tax base or the impact of an erroneous tax base on the income-stream it had purchased. Tr. 36, 53, 98-99 (Allen). Indeed, as noted above, at the time Westdale acquired the Northwest Center, not even GSA was aware of the error in paragraph 15 of the lease, so there was no current dispute of which Westdale could have been aware. Westdale therefore took title to the Northwest Center as a good-faith purchaser without notice of any defect in the lease.

The law limits a court's ability to reform a contract due to mutual mistake: a contract may be reformed for mutual mistake "except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected." Restatement (Second) of Contracts § 155. Comment f to the Restatement elaborates that "[t]he claim of a mistaken party to reformation, being equitable in its origin, is subject to the rights of good faith purchasers for value and other third parties who have similarly relied on the finality of a consensual transaction in which they have acquired an interest in property." *Id.* at cmt. f. The protection of the good-faith-purchaser doctrine extends not only to the purchase of property but to a purchaser who is assigned leases as part of its purchase. *See Nash Finch Co. v. Rubloff Hastings, LLC*, 341 F.3d 846, 850 (8th Cir. 2003) (refusing to reform a lease against a good-faith purchaser despite the mutual mistake of the original parties to the lease because the purchaser "was unaware of the mistake contained in the leases and was therefore a bona-fide purchaser of the leasehold interest").

The rights of a good-faith purchaser for value are often the concern of state property law.[19] In this case, the Northwest Center is in Texas. Texas law establishes that while "'[e]quity will grant relief by way of reformation if circumstances otherwise warrant an exercise of its power,'" there is no entitlement "'to equitable relief against a bona fide purchaser . . . and [the party seeking reformation] has the burden of showing that [the alleged bona-fide purchaser] does not enjoy that status.'" *Newport Oil Co. v. Lamb*, 352 S.W.2d 861, 863 (Tex. App. 1962) (quoting *Miles v. Martin*, 321 S.W.2d 62, 67 (Tex. 1959)). Texas law requires that the good-

---

[19] While federal law governs the interpretation of leases with the federal government, courts may also consider state law for general property- and contract-law principles. *See California Oregon Broad., Inc.*, 74 Fed. Cl. at 399 (noting that while "federal law, rather than state law, governs the interpretation of leases with the United States government," when federal law is not dispositive "courts should look to 'general property and contract law principles as they are embodied in state law pronouncements'" (citing *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986) and quoting *Ginsburg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992))).

faith purchaser receive a warranty deed, as opposed to an instrument such as a quitclaim deed, and that the purchaser lack notice of the mutual mistake prior to purchase to avoid reformation of the contract. *See Miles*, 321 S.W.2d at 68-69. Other jurisdictions impose similar notice requirements on good-faith purchasers to avoid reformation. *See, e.g.*, *United States v. LaRosa*, 765 F.2d 693, 697 (7th Cir. 1985) (citing *Boon v. Chiles*, 35 U.S. (10 Pet.) at 210) ("The courts have held that if a purchaser has actual notice of particular facts which are sufficient to put a reasonably prudent person on duty of inquiry, then the purchaser will be charged with the knowledge that such inquiry, reasonably prosecuted, would have revealed.").

Although Westdale meets the definition of a good-faith purchaser, the Court finds that Westdale's status as a good-faith purchaser does not preclude reformation in this case. The good-faith purchaser exception applies only insofar as the rights of a purchaser are "unfairly affected." Restatement (Second) of Contracts § 155. While Westdale's anticipated income-stream would be reduced were the Court to establish a tax base greater than $133,045, the reduction in income alone is not *ipso facto* unfair. Westdale would, as the government argues, receive a windfall if GSA paid more than its proportional share of the building's taxes because its shell rent was calculated using the estimate of $726,629 for the real-estate taxes. To reform the contract to establish a more reasonable tax base certainly will adversely affect Westdale's income under the lease, but the Court's efforts to arrive at an equitable outcome should not impose an unfair or undue burden on either party. A failure to reform the lease would impose undue hardship on the defendant, and Westdale has not presented sufficient evidence for the Court to conclude that any reformation of the lease would be so unfair as to bar such relief entirely.

Because the Court has concluded that a mutual mistake occurred and that the good-faith purchaser doctrine does not bar reformation so long as the Court's intended reformation does not unduly burden the plaintiff, the Court next considers whether and how the lease may be reformed due to mutual mistake.

### 3.    Reformation for Mutual Mistake

Contract reformation due to mutual mistake is a matter of equity.[20] "The purpose of proving a mistake is to correct what has become an erroneous situation. Equity will act to bring

---

[20] The plaintiff in its briefing makes an "unclean hands" argument, asserting that the government has "unclean hands" in (1) using the lessor's real-estate tax estimate on GSA Form 1217 in paragraph 15 without disclosing that the estimate would become the tax base; (2) failing to read the lease before certifying to Westdale that the lease was in full force and effect and approving payment; (3) failing to issue a final decision before withholding rent payments; and (4) failing to conduct appropriate due diligence in denying Westdale's certified claims. (ECF 138 at 19-21.)

an erroneous writing into conformity with the true agreement. The equitable maxim—equity regards that as done which ought to be done—deals generously to correct mistakes." 27 Williston on Contracts § 70:17 (4th ed. 2021).

This court's general equitable power is traditionally quite limited. *See, e.g.*, *Nicholson*, 29 Fed. Cl. at 185 ("This Court . . . *does not* have general equitable jurisdiction in matters of contracts." (emphasis in original)). Reformation for mutual mistake is an exception to this general limitation. The Federal Circuit has established that this court may reform a contract for mutual mistake. *See, e.g.*, *Am. Emps. Ins. Co. v. United States*, 812 F.2d 700, 705 (Fed. Cir. 1987) ("Reformation is . . . available as an equitable remedy when the parties to a contract have made a mutual mistake of fact." (citation omitted)).

In *National Australia Bank*, the Federal Circuit explained the relevant four-part test for reforming a contract due to mutual mistake:

> Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements:
>
> (1) the parties to the contract were mistaken in their belief regarding a fact;
>
> (2) that mistaken belief constituted a basic assumption underlying the contract;
>
> (3) the mistake had a material effect on the bargain; and
>
> (4) the contract did not put the risk of the mistake on the party seeking reformation.

*Nat. Australia Bank v. United States*, 452 F.3d 1321, 1330 (Fed. Cir. 2006) (citing *Atlas*, 895 F.2d at 750); *accord Bank of Guam v. United States*, 578 F.3d 1318 (Fed. Cir. 2009) (setting out same four-part test), *cert. denied*, 561 U.S. 1006 (2010); *Lakeshore Eng'g Servs., Inc. v. United States*, 110 Fed. Cl. 230 (2013), *aff'd*, 748 F.3d 1341 (Fed. Cir. 2014) (same).

---

The equitable doctrine of "unclean hands" prevents reformation in favor of a party that has acted improperly, *i.e.*, with "unclean hands." In this case, however, the doctrine would not impose a bar on the Court's use of its equitable power to reform the lease. A finding of "unclean hands" requires unconscionable conduct, and "a plaintiff is required to show that the defendant has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Sedarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1361 (Fed. Cir. 2008) (internal quotation omitted). The plaintiff has not made such a showing here. GSA may have been inept in failing to exercise care in drafting the lease and in issuing erroneous payments according to its terms, but the lease reflects a mistake, not a knowing or reckless effort by GSA to injure any party.

The standard of review for assessing whether reformation is appropriate is clear and convincing evidence. *Nat. Australia Bank*, 452 F.3d at 1329. "[R]eformation will not be granted, unless the proof of mistake be 'of the clearest and most satisfactory character.'" *Philippine Sugar Ests. Dev. Co. v. Gov't of Philippine Islands*, 247 U.S. 385, 391 (1918) (quoting *Snell v. Atlantic Fire & Marine Ins. Co.*, 98 U.S. 85, 89 (1878)). "Reformation of a written contract is an 'extraordinary remedy.' . . . It is generally only available on a showing by clear and convincing evidence that the intent of the parties is not expressed by the written instrument, which is to say that the parties both made the same mistake of fact." *Woodies Holdings, L.L.C. v. United States*, 143 Fed. Cl. 485, 496 (2019) (quoting *Nat. Australia Bank*, 452 F.3d at 1329).

The mutual mistake made by the parties satisfies the four factors of the test in *National Australia Bank*. Regarding the first prong, GSA and Griffin Partners "were mistaken in their belief" that they were signing an agreement with a tax base that would accurately adjust GSA's yearly tax payment to ensure GSA pays only its proportional share of the building's real-estate taxes. *Nat. Australia Bank*, 452 F.3d at 1329. Regarding the second prong, that mistaken belief regarding the tax base "constituted a basic assumption underlying the contract." *Id.* Third, the mistaken figure of $133,045 in paragraph 15 "had a material effect on the bargain." *Id.* The tax base of $133,045 written into the lease is significantly lower than what the lessor pays in annual real-estate taxes for the building, yet GSA pays real-estate taxes as part of its shell rent based on a tax estimate of $726,629. The difference between the two figures results in substantially higher payments to the lessor by GSA than either party intended.

The fourth factor requires that the "contract did not put the risk of the mistake on the party seeking reformation." *Nat. Australia Bank*, 452 F.3d at 1329; *see also Roseburg Lumber Co.*, 978 F.2d at 668-69. The Court finds that GSA satisfies this factor, as well. "A party bears the risk of mistake when 1) the risk is allocated to it by agreement of the parties; 2) it is aware, at the time the contract is made, that it has only limited knowledge with respect to the facts to which the mistake relates, but treats its limited knowledge as sufficient; or 3) the risk is allocated to it by the court on the ground that it is reasonable in the circumstances to do so." *Northrop Grumman Corp. v. United States,* 47 Fed. Cl. 20, 55 (2000).

The lease between SAOP and GSA did not place the risk of mistake on GSA. No agreement between the parties allocating the risk of a mistake to GSA is reflected in the text of the lease. Additionally, GSA had substantial knowledge of the lease's contents and cannot be said to have "limited knowledge" with respect to the relevant facts: the lease was a form lease of which SFO Paragraph 4.2 was a standard provision, and GSA drafted its terms. GSA did not enter its negotiations with Griffin Partners with such limited knowledge of the facts that its ignorance merits imputing some of the risk to the defendant. GSA's agents knew the terms of the lease and had familiarity with the tax-adjustment clause but mistakenly included an incorrect tax base in paragraph 15 when it drafted the lease.

As set forth by the test in *Northrop Grumman*, a court may also allocate risk "on the ground that it is reasonable in the circumstances to do so." *Id.* The Court finds that this case does not present such circumstances. Courts have been inclined to allocate risk in a handful of specific scenarios. For example, a court may allocate risk to a contractor when a fixed-price

contract is involved. *See id.* at 55-56 (citing cases noting that "fixed-price contracts shift the risk to the contractor"). Similarly, a court may find a land-sale contract allocates risk to a buyer when the property is sold "as is." *See, e.g., Knieper v. United States*, 38 Fed. Cl. 128, 140 (1997) (citing *Morris v. United States*, 33 Fed. Cl. 733 (1995)).

The doctrine of *contra proferentem* may also present an instance in which a court may allocate risk to the drafter of a contract.[21] Yet *contra proferentem* does not apply to the case before the Court. First, the rule "is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved." *Gardiner, Kamya & Assocs, P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (internal quotation omitted). The Court has already found the tax-adjustment clause of the lease to be unambiguous. Second, the rule is intended to serve as a last resort and is inapplicable if "the intention of the parties . . . otherwise appears." *Id.* (citation omitted). Here, paragraph 4.2 provides evidence of the parties' intent to use either a negotiated amount or the first-year taxes as the tax base; there is no need to construe the lease against GSA as a last-resort.

Finally, GSA's failure to draft the lease correctly or to proofread it with care does not necessarily present appropriate circumstances under which the Court would allocate risk to GSA. *See Fraass Surgical*, 571 F.2d at 37-38 (noting that "failure to read a contract before signing it does not necessarily foreclose reformation"). Indeed, Griffin Partners also failed to read the lease and catch the mistake in paragraph 15.

There are no explicit agreements allocating the risk of a mistake to GSA and no other grounds that would make it reasonable for the Court to find that the risk of mistake remained with GSA. GSA has satisfied the four-part test for seeking reformation of an agreement due to mutual mistake according to *National Australia Bank*.

Because the Court has found that the parties made a mutual mistake in establishing an erroneous tax base in paragraph 15 of the lease, and because the four-part test for reformation in *National Australia Bank* is met under the facts of this case, reformation of the lease is the appropriate and equitable remedy.

## C.    Court's Reformation

The Court must determine an appropriate tax base to insert into paragraph 15 of the lease to replace the $133,045 tax base that was the product of mutual mistake between the original contracting parties. Reformation serves to remedy "mistakes in expression, as in the case of . . . the inclusion of a term not agreed upon or the incorrect reduction of a term to writing." *Gen. Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 529 (2000) (citing E. Allan Farnsworth, Contracts, Sec. 7.5 at 468 (1982)). "'The purpose and function of the reformation of a contract is

---

[21] *Contra proferentem* is a doctrine of interpretation that "requires ambiguities in a contract to be resolved against the drafter." *HPI/GSA 3C, LLC*, 364 F.3d at 1334.

to make it reflect the true agreement of the parties on which there was a meeting of the minds.'" *Atlas*, 895 F.2d at 750 (quoting *Am. President Lines v. United States*, 821 F.2d 1571, 1582 (Fed. Cir. 1987)).

The parties dispute the appropriate reformation. The defendant asserts that the "figure in paragraph 15, $133,045, should have been $726,629." (ECF 137 at 22, citing Tr. 440 (Winn).) The defendant therefore argues that "this Court should reform paragraph 15's real estate tax base to reflect $726,629. No other reformation is needed. Such a reformation accomplishes the intent of the parties." (*Id.* at 22-23.) Westdale disputes that reformation is warranted, arguing that the lease is unambiguous and asserting the good-faith-purchaser defense to reformation. In the event that the Court concludes that reformation is appropriate, however, Westdale argues that "the Lease itself establishes the tax base as the first lease year (i.e., the real estate taxes due for either the 2012 tax year or for the period of January 11, 2012 - January 10, 2013)." (ECF 138 at 22.) Westdale also argues that because it was not privy to the original lease and did not negotiate or draft the lease's terms, it would be prejudiced if the tax base were reformed to $726,629. The defendant responds that it already pays real-estate taxes pursuant to the $726,629 tax estimate for the building derived from GSA Form 1217 and that the $541,020.95 figure Westdale proposes "would fail to fairly adjust the amount of taxes GSA pays annually." (ECF 137 at 23.)

The Court finds that the most equitable result would be to reform paragraph 15 of the lease to substitute for the erroneous tax base in paragraph 15 of the lease a tax base that reflects the agreement the parties actually came to: if the lease did not reflect a negotiated amount for the tax base, then the tax base would be the amount of real-estate taxes levied for the first tax year after the lease began.

Paragraph 4.2 of the SFO, referenced in paragraph 15 of the lease, defined the "Real Estate Tax Base" as "the Unadjusted Real Estate Taxes for the first full Tax Year following the commencement of the Lease term," or "[a]lternatively, the Real Estate Tax Base may be an amount negotiated by the parties that reflects an agreed upon base for a Fully Assessed value of the property." (JX 1B at 19.)

The evidence establishes that the parties did not negotiate a specific real-estate tax base. Mr. Moreland agreed with the statement that he "didn't negotiate [the $133,045 figure]" and that the figure "was just . . . in the document that GSA provided." (Tr. 138, 205 (Moreland).) Ms. Winn's testimony did not contradict Mr. Moreland's assertion, which stands uncontradicted. (*See* Tr. 402-51 (Winn).) The Court finds Mr. Moreland's uncontradicted testimony regarding the lack of negotiation to be credible and consistent with the evidence.

Paragraph 4.2 of the SFO, which the defendant itself prepared and included as a term in the lease, instructs that if the parties do not negotiate the tax base, the default rule is that the real-estate tax base will be the unadjusted first-year taxes following the commencement of the lease term. In this case, the first tax year after the commencement of the lease on January 11, 2012, was tax year 2012. Bexar County assessed SAOP $541,020.95 in 2012. (JX 78.) The plaintiff's argument that the first-year taxes should form the real-estate tax base is premised upon a methodology to which both GSA and the former lessor agreed and is based on the default tax base established by the lease should the parties not negotiate a different tax base.

In considering whether Westdale's rights would be unfairly affected by the Court's chosen reformation, the Court notes the relevant burden on each party.

The injury to GSA from the adoption of a tax base of $541,020.95 is the imposition of covering more than its share of the building's real-estate taxes. The Court recognizes that establishing a tax base below $726,629, the figure used to calculate the portion of real-estate taxes the government pays as part of its shell rent, imposes on the defendant the responsibility to pay more than its pro rata share of real-estate taxes on the building. If Griffin Partners had not sold the building to Westdale and had it remained the owner and current lessor, the Court would not hesitate to rule for the government and reform the contract to reflect a tax base of $726,629. As between the original contracting parties, using the $726,629 figure as the tax base produces the most equitable outcome to ensure GSA pays only its pro rata share of the building's annual real-estate taxes. That result would also reflect that both GSA and Griffin Partners were each in a position to have been able to discover and avoid the mistake in the lease at the time they agreed to its terms.

That is not the case before the Court. Griffin Partners sold the building and its leases to Westdale, which acquired the GSA lease without knowledge of any defects or mistakes in that document. Westdale purchased the building with the understanding that it would receive a particular income-stream. Due to the mutual mistake made by the original contracting parties, Westdale is not receiving the full benefit of the bargain from its purchase, despite reliance on estoppel certificates received from both GSA and SAOP and knowledge that GSA had initially paid real-estate taxes according to the express terms of paragraph 15 of the lease. As between GSA and Westdale, only GSA had the opportunity to catch and fix the error before Westdale, an innocent third party, purchased the property in reliance on the income-stream the building generated. To reform the contract to reflect the $726,629 estimate used to calculate GSA's shell rent would unduly burden Westdale, an innocent third-party, good-faith purchaser. In contrast, the harm of reforming the contract to reflect the $541,020.95 figure is less onerous on the plaintiff and reduces the windfall Westdale would receive if GSA paid according to the express terms of the lease.

Reformation "'is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed.'" *Atlas Corp.*, 895 F.2d at 750 (quoting 3 Corbin on Contracts § 614 at 723 (1960)). This prior-agreement element requires that the party seeking reformation show that the non-moving party "would have agreed to the contract if worded in accordance with the [moving party's] intention." *Fraass Surgical Mfg.*, 571 F.2d at 37. The Court cannot speculate as to what Westdale would have agreed to had it been in the shoes of Griffin Partners at the time of contracting. Westdale may well have assented to the use of either a negotiated amount or the first-year taxes, which were the standard criteria included in GSA's form SFO. Regardless, the parties agree that the lease itself provides for tax adjustment and that "the Government shall pay its share of any increases and shall receive its share of any decreases in the Real Estate Taxes for the Property." Jt. Stip. ¶ 9. Westdale has thus acknowledged that under the lease GSA is meant to pay only its pro rata share of the real-estate taxes. Adhering to the methodology established by paragraph 4.2 reflects the intent of Mr. Moreland, the agent of SAOP who negotiated the original lease, to establish the first-year taxes as the tax base. Reformation is thus in line with the aim that Westdale already accepted. The

Court's reformation of the lease to reflect the $541,020.95 figure also aligns with the reformation Westdale itself proposed if the Court found reformation warranted.

Accordingly, the Court reforms the contract to substitute a tax base of $541,020.95 for the tax base of $133,045 written into paragraph 15 of the lease. The reformed tax base is calculated based on the real-estate taxes for the first year of the lease, as the original contracting parties agreed to in their incorporation of paragraph 4.2 of the SFO into the lease. No other reformation is needed to remedy the mutual mistake of an erroneous tax base or to produce an equitable result.

## IV.  CONCLUSION

The issue in this case involves a single figure: a real-estate tax base written into a lease as "$133,045." Although the figure itself is not on its face ambiguous, several witnesses testified that the tax base as written is a mistake. The Court finds that this mistake was mutual, made by both GSA and the former lessor. The Court finds reformation of the lease to be necessary due to mutual mistake and reforms the lease to reflect a tax base of $541,020.95, the taxes assessed for the building for the first year after the lease began. This reformed tax base acknowledges the prior agreement between the original contracting parties to use either a negotiated tax base or the first-year taxes, and also acknowledges the aim of the tax-adjustment clause, which was to ensure GSA pays only its proportional share of the building's real-estate taxes. It also accommodates Westdale's status as a good-faith purchaser for value.

Paragraph 15 of the lease between GSA and Westdale, reflected at JX 1A at 3, is **REFORMED** to substitute a tax base of $541,020.95 for the incorrect figure of $133,045.[22]

The Court will issue a separate order in accordance with this memorandum opinion to establish a schedule for further proceedings.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

[22] As noted above, the Court has detected minor inaccuracies in the plaintiff's calculation of the amount allegedly due from GSA. Due to these deviations from the Court's own calculations, the Court in a separate order directs the parties to confer and propose to the Court the correct amount of damages due to the plaintiff under the newly supplied tax base.