# In the United States Court of Federal Claims

No. 16-113
Filed: May 25, 2022
FOR PUBLICATION

---

**WESTDALE NORTHWEST CENTER, LP,**

　　　　　　*Plaintiff*,

**v.**

**UNITED STATES,**

　　　　　　*Defendant*.

---

*Jennifer A. Gehrt*, Barbee & Gehrt, LLP, Dallas, TX, for the plaintiff.

*Michael D. Austin*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant, with *Helen Kerns*, General Counsel Office, General Services Administration, of counsel.

## MEMORANDUM OPINION

***HERTLING*, Judge**

The Court awarded judgment for the plaintiff, Westdale Northwest Center, LP ("Westdale"), after a trial on the merits regarding a contract dispute. The Court reformed a lease between Westdale and the defendant, the United States, acting through the General Services Administration ("GSA").

The plaintiff now seeks attorney's fees and research expenses as authorized by the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, in the amount of $106,058.99. Under the EAJA, the plaintiff was a "prevailing party," and the government's position was not "substantially justified." Westdale prevailed, however, on only some of its claims. Awarding attorney's fees for time spent on the entire litigation therefore would not be reasonable. Accordingly, the Court grants the plaintiff's motion for attorney's fees in part and awards the plaintiff $76,064.31.

## I.     BACKGROUND

The Court's decision on the merits, *Westdale Northwest Center, LP v. United States*, 154 Fed. Cl. 557 (2021), sets forth the facts of this case, which are only briefly recounted here.

### A.      Factual Background

Westdale leases office space to GSA in San Antonio, Texas.  GSA drafted the lease and negotiated it with Griffin Partners, Inc., ("Griffin Partners") from which Westdale acquired the building.  SAOP Northwest Center, LP ("SAOP"), a single-asset entity of Griffin Partners, renewed a lease with GSA in 2010.  Under the lease, the parties intended that GSA pay its share of the lessor's real-estate taxes to Bexar County at a rate proportional to the percentage of the building GSA occupied.

The lease defined the real-estate tax base as "the Unadjusted Real Estate Taxes for the Property for the first full Tax Year for which the Real Estate Taxes are based upon a Full Assessment," or alternatively, "an amount negotiated by the parties that reflects an agreed upon base for a Fully Assessed value of the property."  *Id.* at 567.  The unadjusted real-estate taxes on the property for the first full tax year after a full assessment were an amount with a base of $726,629.  For the first year of the lease, SAOP paid $541,020.95 in taxes to Bexar County for the whole building.  The lease, however, reflected neither of those figures; paragraph 15 of the lease noted: "In accordance with the SFO Paragraph 4.2 entitled 'Tax Adjustment,' this lease is subject to real estate tax adjustment. The base amount is established as $133,045.00."  *Id.* at 566.

In 2012, because SAOP's actual tax assessed ($541,020.95) exceeded the real-estate tax base established in the lease ($133,045), SAOP determined that GSA had underpaid its portion of real-estate taxes and requested an additional payment of $37,348.98.  GSA paid that amount.

Westdale acquired the building from SAOP in 2013.  Westdale had conducted due diligence during which a GSA contracting officer had sent Westdale a letter informing Westdale that the lease was in full force and effect, no rental was paid in advance, and there were no notices of default.  At the time, SAOP and GSA were unaware of the mistake in the tax base in the original lease.  Upon acquiring the building from SAOP, Westdale assumed all of SAOP's obligations and liabilities under the lease with GSA.

In 2014, Westdale sent GSA a letter pertaining to taxes owed for the year 2013.  Westdale notified GSA that it owed Westdale $86,446.84, which GSA paid.  A few months later, following an audit of the lease, GSA determined that it had overpaid its portion of real-estate taxes by $79,027.78.  GSA deducted that amount from its rent payments until the amount was repaid in full.  GSA also notified Westdale for the first time of its position that the real-estate tax base listed in the lease was erroneous.

In 2015, Westdale and GSA amended the lease to increase the space occupied by GSA.  Even as the parties amended the lease, they retained the original tax base, $133,045, despite GSA's claim that it was erroneous.  A few months after the lease amendment, Westdale again notified GSA via email that GSA owed it more money under the lease for its share of the real-estate taxes for tax year 2014.  A GSA contracting officer contested that assertion, argued that GSA had overpaid, and sought to amend the tax base in the lease, but Westdale declined to sign the amendment.

Westdale and GSA continued to dispute the amounts GSA owed for tax years 2015 through 2019.  Each year, Westdale requested GSA pay additional sums pursuant to the real-estate tax base specified in the lease, but GSA would pay only a fraction of that amount. Westdale presented four certified claims to a GSA contracting officer for the alleged shortfalls in the real-estate tax payments under the lease, and the contracting officer issued four final decisions denying those claims.

### B.      Procedural Background

The plaintiff filed a five-count complaint on January 27, 2016.  (ECF 1.)  In Count One, the plaintiff alleged that the defendant had breached the contract by failing to pay all money due under the lease.  (*Id.* at 13.)  In Count Two, the plaintiff alleged that the defendant had breached the contract by withholding rent payments.  (*Id.* at 13-14.)  In Count Three, the plaintiff alleged that the defendant had breached the contract by withholding payments exceeding those claimed. (*Id.* at 14.)  The plaintiff sought declaratory relief in Count Four.  (*Id.* at 14-15.)  In Count Five, the plaintiff requested reformation of the lease, in the alternative, should the Court find that the tax base was a result of mutual mistake or scrivener's error.  (*Id.* at 15-17.)

The defendant filed a motion to dismiss under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") or, in the alternative, a motion for summary judgment under RCFC 56(a).  (ECF 9.)  The defendant's motion to dismiss was denied, and consideration of the defendant's motion for summary judgment was stayed pending discovery.  (ECF 28.)  The case was referred for alternative dispute resolution ("ADR") (ECF 44), which proved unsuccessful. (ECF 49.)  Upon the close of discovery and the end of the ADR, the parties cross-moved for summary judgment.  (ECF 55; ECF 57.)  Their motions were denied because the then-presiding judge determined there remained genuine issues of material fact as to the intent of the original parties to the lease.  (ECF 62.)  The case was then transferred to the undersigned.  (ECF 65.)

The Court held a trial in January 2021.  The plaintiff argued that the contract unambiguously noted that $133,045 was the real-estate tax base.  (Post-Trial Br., ECF 138 at 5.) The plaintiff also argued that the error, to the extent that the tax base was erroneous, was a unilateral mistake by the government for which the government should bear responsibility. Furthermore, as a good-faith purchaser for value, the plaintiff contended that it was entitled to damages for GSA's breach of contract and that reformation of the contract was inappropriate. The plaintiff also argued that the defendant's unclean hands and ratification or waiver of the mistake precluded it from withholding the funds due to the plaintiff.  The plaintiff sought damages of $567,376.80.

The defendant argued that the lease was ambiguous regarding the appropriate tax base and that the tax base listed in the original lease was a result of mutual mistake.  (Post-Trial Br., ECF 137 at 21-22.)  The defendant sought reformation of the contract to implement the figure of $726,629 as the real-estate tax base.

The plaintiff opposed contract reformation but argued as a "strictly alternative claim" that if the Court were to reform the contract, the amount $726,629 would be inappropriate to use as a tax base.  (ECF 138 at 22-23.)

The Court concluded that the tax base in the lease was unambiguous—it was neither patently nor latently ambiguous.  The erroneous tax base was not so obvious that the parties should have noticed it; GSA had the opportunity to notice the error in drafting the lease, amending the lease, and considering its additional payments of real-estate taxes to the lessor in 2012 and 2013.  The tax-base figure also was not reasonably susceptible to more than one interpretation.

Although the tax base in the lease was unambiguous, the Court considered the defense of mutual mistake offered by the defendant.  The Court found based on witness testimony that the original tax base of $133,045 in the terms of the lease reflected mutual mistake by the original contracting parties.  Although Westdale was a good-faith purchaser, that fact did not preclude reformation of the contract.

The Court determined that reformation was appropriate but rejected the defendant's proposed tax base of $726,629.  If the original lessor, Griffin Partners, had been the plaintiff, "the Court would not [have] hesitate[d] to rule for the government and reform the contract to reflect a tax base of $726,629." *Westdale*, 154 Fed. Cl. at 587.  Westdale, however, was not "receiving the full benefit of the bargain from its purchase," and using the $726,629 estimate "would unduly burden Westdale, an innocent third-party, good-faith purchaser." *Id.*  The Court therefore reformed the contract to reflect a tax base of $541,020.95, which was based on real-estate taxes for the first year of the lease and more accurately reflected the intention of the negotiating parties. *Id.* at 586-87.

Based on the parties' calculation of damages and interest, the Court directed the Clerk to enter final judgment for the plaintiff in the amount of $173,226.14.  (ECF 149.)  Neither party appealed.  Costs were taxed in the amount of $5,919.12 against the defendant.  (ECF 163.)

The plaintiff then filed a timely motion for attorney's fees and research expenses under the EAJA in the amount of $104,197.83.  (ECF 158 at 23.)  The defendant filed a response opposing the plaintiff's motion.  (ECF 166.)  The plaintiff filed a reply brief and appended to that brief a declaration in support of its claim that its counsel had spent 9.2 hours responding to the defendant's opposition to the motion, corresponding to $1,861 in additional fees.  (ECF 168, 169.)

The Court convened the parties for a status conference on March 16, 2022, during which the Court provided its impressions on the pending EAJA-fee application and gave the parties 45 days to attempt to resolve the plaintiff's motion between themselves.  On April 27, 2022, the parties filed a joint status report indicating that they were unable to reach an agreement.  (ECF 174.)  Oral argument is not necessary to resolve the motion.

## II.    DISCUSSION

The EAJA permits the court to award attorney's fees to a plaintiff if certain conditions are met:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

The Supreme Court has set forth four requirements for a fee award in a civil action:

> (1) that the claimant be a "prevailing party"; (2) that the Government's position was not "substantially justified"; (3) that no "special circumstances make an award unjust"; and, (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement.

*Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 158 (1990).

Under the EAJA, a "party" includes a partnership with a net worth not exceeding $7,000,000 and no more than 500 employees.  28 U.S.C. § 2412(d)(2)(B).  The term "fees and other expenses" "includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees," which are not to exceed $125 per hour unless there has been an increase in the cost of living or a special factor. *Id.* § 2412(d)(2)(A).

In its motion for attorney's fees, the plaintiff argues that it meets all criteria for award under the EAJA.  (ECF 158.)  The defendant does not dispute that Westdale qualifies as a "party" under the EAJA, that the plaintiff's proposed hourly rate is reasonable, or that the plaintiff's application is timely.   (ECF 166 at 3-4.)  The defendant also does not argue that a special circumstance makes award unjust.  Rather, in its response opposing the plaintiff's motion, the defendant disputes that the plaintiff is a "prevailing party" and argues that the government's position was "substantially justified."  In the alternative, the defendant argues that the plaintiff's fees should be reduced to account for the limited success achieved in the litigation. (*Id.* at 11.)

Remaining in dispute are three issues: (1) whether the plaintiff qualifies as a "prevailing party"; (2) whether the government's position was "substantially justified"; and (3) if the plaintiff is entitled to attorney's fees, whether those fees are subject to reduction.

### A.    Prevailing Party Status

#### 1.    Legal Standard

The EAJA does not define a "prevailing party" as it relates to this type of litigation.[1]  The Supreme Court has held that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992).  In short, "a 'prevailing party' is one who has been awarded *some* relief by the court . . . ." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't Health & Hum. Res.*, 532 U.S. 598, 603 (2001) (emphasis added).

The Supreme Court has consistently held that the magnitude of relief awarded is irrelevant to the question of whether a plaintiff prevailed.  *See Buckhannon*, 532 U.S. at 603; *Farrar*, 506 U.S. at 114.  For example, a party "prevailed" in litigation even when it received only nominal damages.  *Farrar*, 506 U.S. at 112.  A party that obtained a court-ordered consent decree was also deemed to have prevailed.  *Hanrahan v. Hampton*, 446 U.S. 754, 756-57 (1980).[2]  The Federal Circuit has held that plaintiffs prevailed when they succeeded on the merits upon remand to an agency when a court retained jurisdiction.  *Former Emps. Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1367 (Fed. Cir. 2003).  If the defendant's voluntary change in conduct, however, is what causes the material alteration of the legal relationship, the plaintiff is not a "prevailing party."  *See Buckhannon*, 532 U.S. at 605.

#### 2.    Application of the Legal Standard

The plaintiff argues that it is a "prevailing party" because the post-trial decision materially altered the lease governing the legal relationship between Westdale and GSA, resulting in a judgment for the plaintiff and an award of damages in the amount of $173,226.14, inclusive of interest.  (ECF 158 at 6-7.)

The defendant argues that the Court "explicitly granted the United States' affirmative defense of reformation due to mutual mistake."  (ECF 166 at 5); *see Westdale*, 154 Fed. Cl. at 582-85.  The defendant contends that the plaintiff does not qualify as a prevailing party just

---

[1] The EAJA defines "prevailing party" only regarding "eminent domain proceedings." 28 U.S.C. § 2412(d)(2)(H).

[2] Although *Farrar* and *Hanrahan* address the meaning of "prevailing party" under the Civil Rights Attorney's Fees Award Act of 1976, the "Supreme Court has interpreted the phrase 'prevailing party' consistently across all federal fee-shifting statutes." *Former Emps. Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1364 (Fed. Cir. 2003).

because the Court employed equitable principles when reforming the lease to reflect the real-estate tax base proposed by the plaintiff only as an alternative last resort. The defendant notes that the plaintiff was unsuccessful on the first four counts in its complaint and did not recover most of the damages it sought.

The plaintiff counters that the success of the plaintiff's alternative claim for relief should not preclude an award of attorney's fees. (ECF 168 at 4-9.) The plaintiff underscores that the Court also ruled against the defendant regarding the ambiguity of the contract.

The defendant's understanding of the legal standards defining a "prevailing party" is too rigid. The Court did adopt some of the defendant's arguments, including that the tax base in the contract was due to mutual mistake, that parol evidence was admissible, and that reformation of the lease was appropriate. The question, however, is not whether the *defendant* prevailed on any claims, but rather whether the *plaintiff* prevailed on any of its claims. And the plaintiff prevailed in arguing that the defendant's proposed tax base was incorrect and that the GSA had wrongfully withheld portions of its rent payments under its erroneous interpretation of the lease. This claim was at the heart of Count Five of the plaintiff's complaint and was argued in the alternative at trial. Although the plaintiff did not obtain relief directly on the other counts in its complaint and was not awarded all the damages it sought, those facts do not preclude the finding that Westdale is a "prevailing party" eligible for an award under the EAJA. *See Buckhannon*, 532 U.S. at 603; *Farrar*, 506 U.S. at 114.

Under the Supreme Court's precedents, the plaintiff was a "prevailing party." The post-trial decision materially altered the legal relationship between the parties to the plaintiff's benefit and awarded the plaintiff some relief on the merits. *See Farrar*, 506 U.S. at 111; *Buckhannon*, 532 U.S. at 603. Prior to the litigation, the "legal relationship" between Westdale and GSA was in dispute: Westdale was operating under the assumption that $133,045 was the correct tax base; GSA was operating as if $726,629 was the correct tax base. GSA was withholding rent payments based on its understanding of what the lease terms were meant to be, and Westdale disputed those withholdings.

The decision altered the relationship between the parties and modified the defendant's behavior by reforming the lease to include a tax base that reflected the intention of the original parties to the lease. The relationship was altered to the plaintiff's benefit: the government was ordered to pay damages to the plaintiff, and the basis for GSA's withholding of rent payments was rejected. The plaintiff was awarded damages in the amount of $173,226.14, inclusive of interest, in addition to costs. The plaintiff was not awarded all it sought. Its preferred reading of the lease was rejected, and the damages awarded were far less than the plaintiff had sought. Nonetheless, once mutual mistake was found to exist in the drafting of the real-estate tax base, the plaintiff's proposed reformation was chosen over the reformation proposed by the defendant. The plaintiff received "some relief" under the post-trial decision and is thus a "prevailing party." *Buckhannon*, 532 U.S. at 603.

### B.      Substantial Justification

Once a plaintiff is found eligible for an award under the EAJA, the burden shifts to the government to demonstrate that its position was substantially justified. *Scarborough v. Principi*, 541 U.S. 401, 414 (2004).  A position is substantially justified if it has a "reasonable basis both in law and fact," or, in other words, is "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The "'position of the United States' means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based . . . ." 28 U.S.C. § 2412(d)(2)(D).  In evaluating motions for attorney's fees under the EAJA, "the entirety of the conduct of the government is to be viewed, including the action or inaction by the agency prior to litigation." *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991).  A court must make "only one threshold determination for the entire civil action" as to whether the defendant's position was substantially justified. *Jean*, 496 U.S. at 159.  The Court therefore analyzes both GSA's position giving rise to the litigation and the defendant's position during the litigation.

### 1.      GSA's Position before Litigation

The plaintiff argues that GSA exhibited a "lack of diligence" on numerous occasions, including by failing to refer to the actual language of the lease when disagreements arose and by improperly certifying to Westdale that the lease was in full force and effect and that no rents had been paid in advance. (ECF 158 at 11-12.)  The plaintiff also contends that the GSA contracting officer acted as a mere "rubber-stamp" in approving the lease and that GSA violated the Contract Disputes Act ("CDA") by withholding rent payments without first making a claim and obtaining a final decision from a contracting officer on that claim. (*Id.* at 12.)

In responding to the plaintiff's motion, the defendant does not address GSA's conduct prior to the litigation. (ECF 166 at 9-12.)  The defendant asserts that the plaintiff's "cherry pick[ing]" of instances when the government's position was not substantially justified "reflects a misunderstanding of substantial justification." (*Id.* at 10.)

The post-trial decision provides three examples of instances in which GSA's conduct with respect to the lease and the plaintiff was patently wrong and unjustifiable.  First, the "GSA drafted the lease incorrectly by including an erroneous tax base." *Westdale*, 154 Fed. Cl. at 579. SAOP failed to catch the error when its officials reviewed the proposed lease, but that oversight does not excuse the initial error made by GSA officials.  Second, GSA proceeded to pay SAOP and Westdale according to the express, albeit erroneous, real-estate tax base for the first two years of the lease.  Third, even when GSA increased its occupancy and amended the lease to reflect added square footage (which should have resulted in a revision to the real-estate tax base), GSA officials failed to catch their earlier error and repeated it in the revised lease.  GSA made the same mistake "in multiple instances that could have been caught through accurate drafting and careful proofreading." *Id.*

Even after GSA officials uncovered the error they had made when drafting the lease, the remedial actions they took did not reflect a "reasonable basis both in law and fact." *Underwood*, 487 U.S. at 565. GSA failed to recognize that Westdale, as an innocent third party, was not at fault for the mistake in the lease; GSA itself had erred. Furthermore, GSA declined to resolve the dispute through negotiation, mediation, or CDA processes, choosing instead to withhold rent payments despite the absence of a final CDA decision on the record.[3]

The defendant, in its briefing on this motion, has chosen not even to try to show that GSA's actions during the pre-litigation portion of this dispute were substantially justified. The defendant cannot meet its burden with silence. *See Scarborough*, 541 U.S. at 414 (holding that the government bears the burden of substantially justifying its conduct). The GSA's pre-suit behavior was not substantially justified.

### 2.	The Defendant's Position in Litigation

The plaintiff also argues that the defendant's position during the litigation was not substantially justified. (ECF 158 at 16-20.) The plaintiff contends that the defendant's motion to dismiss the case under RCFC 12(b)(6) resulted in a needless year-long delay. Additionally, the plaintiff argues that the defendant advanced inconsistent positions and delayed pleading any affirmative defenses until less than a year before the case was tried.

The defendant argues that its position was substantially justified because the Court ultimately accepted its argument that the real-estate tax base provision of the lease was a result of mutual mistake and, accordingly, reformed the contract. (ECF 166 at 9-10.) The defendant also underscores that the plaintiff did not prevail on all its claims, and the plaintiff did not recover the full amount of the damages it sought.

The plaintiff replies that the defendant's silence on the specific issues highlighted by the plaintiff demonstrate "that the Government did not prove that its conduct was substantially justified because it refused to address its conduct at all." (ECF 168 at 13.)

---

[3] In its motion for attorney's fees, the plaintiff argues that GSA was required to obtain a final decision of a contracting officer before withholding rents due under the lease. (ECF 158 at 14-15.) The plaintiff advanced the same argument at trial. (ECF 138 at 10-11.) The legality of GSA's actions is debatable. *Compare* 41 U.S.C. § 7103(a)(3) (providing that claims by the government against a contractor "shall be the subject of a written decision by the contracting officer"), *with Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed. Cir. 1998) (holding that a final CDA decision was unnecessary when the agency setoff was used to recoup money owed due to a billing error). The Court need not resolve whether GSA acted unlawfully, however, because the defendant's failure to defend its pre-litigation conduct is dispositive for purposes of the plaintiff's motion for fees under the EAJA.

The defendant correctly notes that it prevailed on the major premise of its position, but that fact alone is insufficient to demonstrate that its overall position during the litigation was substantially justified. The Supreme Court has addressed this issue:

> Obviously, the fact that one other court agreed or disagreed with the Government does not establish whether its position was substantially justified. Conceivably, the Government could take a position that is not substantially justified, yet win; even more likely, it could take a position that is substantially justified, yet lose.

*Underwood*, 487 U.S. at 569. Rather than simply looking at the final scoreboard, a court must examine objective indicia of the merits of the government's litigating position in determining whether the government's position in litigation was substantially justified. *See id.*

Contrary to the plaintiff's assertion, the defendant's position has been consistent. The real-estate tax base reflected in the terms of the lease was in error, and, due to that error, Westdale requested GSA to pay a disproportionate share of the property taxes levied on the building. The defendant clung tenaciously to the position that the only proper reformation of the lease would be to strike the real-estate tax base of $133,045 and substitute in its place a tax base of $726,629. That latter number reflected the estimated tax base SAOP included in its proposal to GSA, and the rent was calculated using that tax base. Reforming the lease to include any number other than $726,629 would result in the defendant having to cover more than its share of the real-estate taxes. The Court acknowledged that had the plaintiff been SAOP, the defendant's proposed real-estate tax base would have been adopted. *Westdale*, 154 Fed. Cl. at 586. SAOP was not, however, the plaintiff.

At all stages of the litigation, the defendant failed to recognize that Westdale was not an original party to the lease and therefore had no reason to know of the mistake in the real-estate tax base. The mistake was unambiguous and entirely the fault of the defendant and the original lessor. The defendant made lease payments in accordance with the unambiguous but erroneous lease provision during the first two years of the lease, including the period when Westdale was purchasing the building. The plaintiff is not a mind-reader, yet the defendant unilaterally interpreted the lease in a manner that penalized the plaintiff for failing to read the minds of GSA officials. Notwithstanding the merit of the defendant's claim of mutual mistake, the defendant's consistent failure to acknowledge the critical fact that the plaintiff was a good-faith, third-party purchaser of the property leads to the conclusion that its position during the litigation was not "justified to a degree that could satisfy a reasonable person." *Underwood*, 487 U.S. at 565.

In addition, the defendant's failure to engage the plaintiff's specific complaints regarding its conduct weighs against finding that its position was substantially justified. In *CEMS, Inc. v. United States*, Judge Horn observed that "the government cannot demonstrate that its conduct was reasonable when the government refuses to address its conduct at all." 65 Fed. Cl. 473, 482 (2005). Similarly, in this case, the defendant's focus on the outcome of the case rather than the substance of its position does not satisfy its burden to demonstrate that its position was substantially justified.

10

The defendant's emphasis on the amount of the plaintiff's recovery is also misplaced.  In *Baldi Bros. Constructors v. United States*, the defendant also chose not to justify its position and instead asserted "that because plaintiff ultimately recovered only 55% of the amount of damages sought, the substantial justification of the Government's litigation position is self-evident." 52 Fed. Cl. 78, 81 (2002).  Another judge of this court held that "the fact that the Government successfully defeated certain claims does not alone establish that it so acted with substantial justification." *Id.* at 82.  Analogously, in this case, the damages the plaintiff sought as opposed to the amount it received is inapposite; the defendant's success in defeating some of the plaintiff's claims is also irrelevant.  The defendant must establish that its position was substantially justified, and the defendant's focus on the plaintiff's relief rather than the justification of its own position misses the point.

In sum, the defendant has failed to satisfy its burden of demonstrating that its overall position was substantially justified, both prior to and during the litigation.

## C.    Reduction of Fees

The conditions for eligibility for EAJA fees reflect "a generous formulation that brings the plaintiff only across the statutory threshold.  It remains for the [trial] court to determine what fee is 'reasonable.'"  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (discussing the standards applying to a "prevailing party"); *see also Jean*, 496 U.S. at 160-61 (applying this language to all conditions for eligibility under the EAJA).  The EAJA provides that "a court may award *reasonable* fees and expenses of attorneys . . . ."  28 U.S.C. § 2412(b) (emphasis added).  When determining whether proposed EAJA fees are "reasonable," "the most critical factor is the degree of success obtained."  *Hensley*, 461 U.S. at 436.

In *Hensley*, the Supreme Court explained when it is appropriate for a trial court to award less than the fee sought:

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee.  Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.  But where the plaintiff achieved only

11

> limited success, the district court should award only that amount of
> fees that is reasonable in relation to the results obtained.

461 U.S. at 440.[4]  Therefore, when a plaintiff achieves "limited success," fee reduction is appropriate.

Westdale did not prevail on all its claims.  Its primary assertion, reflected in the first four of the five claims of its amended complaint, was that the lease should be enforced as written and that Westdale should receive damages in the amount of $567,376.80 plus interest.  The plaintiff failed on its claims to enforce the lease as written.  Hence, four of the plaintiff's five claims were rejected in full.  Instead, the Court adopted the reformation proposed in the plaintiff's fifth claim, resulting in a recovery of $173,226.14, including interest.  The plaintiff therefore achieved only "limited success," so the plaintiff's proposed attorney's fees should be reduced.  *Hensley*, 461 U.S. at 440.

The question then becomes what amount of fees is "reasonable in relation to the results obtained."  *Id.*  In reducing fees, a court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.  The court necessarily has discretion in making this equitable judgment."  *Id.* at 436-37.

### 1.       Reduction of Specific Hours

The Federal Circuit has held that "courts properly award attorney fees for time necessarily spent on a successful claim, even if that time was also spent on unsuccessful claims." *Smith v. McDonough*, 995 F.3d 1338, 1345 (Fed. Cir. 2021).  "The relevant inquiry is whether the time spent was 'reasonably expended.'"  *Id.* (quoting *Wagner v. Shinseki*, 640 F.3d 1255, 1262 (Fed. Cir. 2011)).  When a trial court reduces a fee request, it must "provide a reasoned explanation as to why particular attorney hours should be excluded."  *Wagner*, 640 F.3d at 1261.

As summarized above, this case has a protracted procedural history.  The plaintiff seeks attorney's fees and research expenses for drafting the complaint, defeating the defendant's motion to dismiss, moving for summary judgment, preparing for trial, conducting trial, drafting post-trial briefs and proposed findings of fact, and pursuing its EAJA request.  (ECF 158 at 23.)

The defendant argues that if the plaintiff is eligible for fees under the EAJA, the plaintiff "would be entitled to an award of fees only for the time it spent in contesting [the defendant's] affirmative defense."  (ECF 166 at 10.)  The defendant's proposed reduction contravenes *Jean*, in which the Supreme Court articulated a presumption for awarding fees based on the outcome of the case as a whole:

---

[4] Although *Hensley* involved a fee-shifting provision from the Civil Rights Act, the Federal Circuit has held that the same definition of "reasonable" applies under the EAJA.  *Hubbard v. United States*, 480 F.3d 1327, 1331 (Fed. Cir. 2007).

> [A] fee award presumptively encompasses all aspects of the civil
> action. Any given civil action can have numerous phases. While
> the parties' postures on individual matters may be more or less
> justified, the EAJA—like other fee-shifting statutes—favors
> treating a case as an inclusive whole, rather than as atomized line-
> items.

496 U.S. at 161-62 (internal footnote omitted).

Applying this precedent, the Federal Circuit has awarded attorney's fees for time spent reviewing the initial record even when some of that time was spent researching unsuccessful claims, reasoning that reviewing the record was "indispensable" to pursuing the plaintiff's claims. *Smith*, 995 F.3d at 1345.

Similarly, in this case, it was "indispensable" that the plaintiff drafted its complaint, defeated the defendant's motion to dismiss, engaged in discovery and settlement discussions, and prepared for trial to prevail on its successful claim. *See id.* The defendant's proposal that any award of attorney's fees be limited only to time expended countering the defendant's affirmative defense at trial is inconsistent with *Jean* and *Smith*. Pursuant to *Jean*, the plaintiff's case must be treated presumptively as "an inclusive whole," unless some of the proposed attorney's fees prove unreasonable. *See* 496 U.S. at 161-62.

The plaintiff's proposed attorney's fees are subject to reduction for the time spent on the plaintiff's unsuccessful cross-motion for summary judgment. When a plaintiff achieves limited success arguing a particular theory at a discrete stage of the litigation, hours spent developing that theory should be excluded from award under the EAJA. *See Hubbard v. United States*, 80 Fed. Cl. 282, 284-85 (Fed. Cl. 2008) (reducing an award for hours spent on an unsuccessful theory of damages), *aff'd*, 315 F. App'x 307 (Fed. Cir. 2009). The plaintiff's cross-motion was denied due to the existence of genuine issues of material fact regarding the intent of the parties to the contract, and the plaintiff should have known that outstanding factual issues would prevent a ruling in its favor at that stage of the litigation. The time the plaintiff spent drafting its own summary-judgment motion therefore was not "reasonably expended." *See Wagner*, 640 F.3d at 1262. It was necessary, however, for the plaintiff to expend time and resources to defeat the defendant's motion for summary judgment.

The plaintiff reports that it spent a total of 97.3 hours analyzing and responding to the defendant's motion for summary judgment and preparing its own cross-motion for summary judgment. (ECF 158 at 22.) From the plaintiff's billing records, it appears that of those 97.3 hours, 28.6 hours were reasonably expended reviewing documents produced by the defendant, reviewing and analyzing the defendant's motion for summary judgment, researching cases cited in the defendant's motion, and preparing for and attending status conferences. The plaintiff is entitled to fees for those hours. The plaintiff, however, spent 3.6 hours developing its own summary-judgment strategy before the defendant filed its motion for summary judgment. (ECF 159 at 101.) Those hours should be excluded from the award of attorney's fees.

13

From billing records, it appears that the plaintiff spent the remaining 65.1 hours working simultaneously on its response to the government's motion for summary judgment and its own cross-motion for summary judgment, which it filed jointly.  (*See* ECF 57.)  Some of that time was also spent on the plaintiff's reply brief.  The plaintiff's records do not indicate how much time the plaintiff spent countering the defendant's claims as opposed to raising its own claims, but the filings themselves reflect that about half of the issues the plaintiff raised were in response to the defendant's motion, while about half were its own arguments.  (*See id.*)  The time the plaintiff spent supporting its own cross-motion was not reasonably expended.  Accordingly, the plaintiff's fees should be reduced by an additional 32.6 hours, representing half of the plaintiff's time spent at the summary-judgment stage.

The plaintiff's fees are therefore reduced by a total of 36.2 hours, which corresponds to a reduction of $7,323.26 to the award, according to the plaintiff's calculation method.[5]

The plaintiff also incurred $772.88 in legal research expenses during the summary-judgment stage.  (ECF 158 at 23.)  Of those expenses, the plaintiff spent $153.95 researching its own summary-judgment strategy prior to the defendant's filing of its motion for summary judgment; that expense should therefore be excluded from the award.  (ECF 159 at 101.)  The plaintiff spent $14.08 researching cases cited in the defendant's motion for summary judgment, and the plaintiff is entitled to reimbursement for that expense.  (*Id.* at 113.)  The plaintiff, however, spent the remaining $604.85 on research for its joint response to the defendant's motion and cross-motion for summary judgment.  Again, it is unexplained in the record exactly how much of the expenses stem from the plaintiff's claims as opposed to the defendant's claims, but the plaintiff's summary-judgment briefs suggest that about half of the expenses were likely allocated to issues advanced solely by the plaintiff.  Accordingly, the plaintiff's proposed legal-research expense award is reduced by $456.38.

### 2.    Reduction of the Overall Award

The Supreme Court has held that a party's limited success sometimes requires a reduction in an award of attorney's fees:

> If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.  This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.  Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring

---

[5] The plaintiff employs the "mid-point method" for calculating attorney's fees with cost-of-living increases.  (ECF 158 at 4-6); *see 2M Rsch. Servs., LLC v. United States*, 148 Fed. Cl. 99, 108-09 (explaining the "mid-point method").  Using that method, the plaintiff arrived at an hourly rate of $202.30.  (ECF 158 at 23.)  The defendant does not dispute the reasonableness of that hourly rate.

> a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

*Hensley*, 461 U.S. at 436.

No rigid formula exists for determining the appropriate amount by which to reduce fees for unsuccessful claims. *Id.* The Federal Circuit has rejected, for example, mechanically awarding a ratio of attorney's fees based on the ratio of claimed damages that the plaintiff recovered. *Hubbard v. United States*, 480 F.3d 1327, 1333-34 (Fed. Cir. 2007). Rather, any reduction must be decided on a case-by-case basis while accounting for all relevant factors through the exercise of sound discretion. "The trial court has considerable discretion in determining reasonable attorney fees." *Id.* at 1334-35. This discretion is "appropriate in view of the [trial] court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437.

In this case, awarding the plaintiff the full amount of attorney's fees requested would be excessive given the results it achieved. The plaintiff was awarded a fraction of the damages it sought, and the plaintiff's arguments that formed the core of its claims were rejected. The plaintiff prevailed only on its claim offered in the alternative, and that claim mirrored the defendant's primary argument in most respects. The plaintiff's claims were interrelated, nonfrivolous, and brought in good faith, but that reality does not preclude a reduction in an EAJA fee award when granting the full amount requested would not reflect the extent of the plaintiff's success. The plaintiff's fee award therefore must be reduced. *See Hensley*, 461 U.S. at 436.

The Court declines to apply a specific, rigid formula to reduce the plaintiff's recovery of attorney's fees, *i.e.*, awarding the plaintiff only one-fifth of its requested attorney's fees because the plaintiff prevailed on one of its five claims, or awarding the plaintiff only 30 percent of its requested attorney's fees because the plaintiff received approximately 30 percent of the damages it sought. *See Hubbard*, 480 F.3d at 1333-34.

In the absence of a specific formula, the Court determines that a reduction of 25 percent in the fees sought by the plaintiff is appropriate.[6] This reduction reflects that, on the one hand,

---

[6] Other judges of this court have also exercised their equitable discretion in determining an appropriate, if unscientific, percentage of recovery for attorney's fees. The Court follows this approach in resolving the plaintiff's motion. *See, e.g.*, *Shea v. United States*, 154 Fed. Cl. 1, 7 (2021) (reducing an award by 30 percent due to the plaintiff's limited success); *Stimson Lumber Co. v. United States*, 154 Fed. Cl. 694, 706-09 (2021) (reducing fees at different stages of the litigation by 50 percent, 45 percent, or 20 percent), *appeal filed*, No. 22-1201 (Nov. 30, 2021); *Haggart v. United States*, 151 Fed. Cl. 58, 67-70 (2020) (reducing some awards of legal fees and expenses by 35 percent or 50 percent); *Gregory v. United States*, 110 Fed. Cl. 400, 404-06

the plaintiff did not prevail on its core claims.  On the other hand, the plaintiff's successful claim was closely related to the plaintiff's unsuccessful claims and relied on the same evidence.  Indeed, the facts presented at trial were largely not contested; only the legal effect of the facts was disputed.  Additionally, the plaintiff's counsel has already meticulously culled many of the hours she worked in her application for EAJA fees.  The plaintiff's request for fees for approximately 500 hours of work in a case that lasted five years and went to trial is hardly outrageous.  Nonetheless, the Court must consider the degree of success the plaintiff achieved.  A reduction of 25 percent compensates the plaintiff for counsel's work on the case while accounting for the limited degree of success achieved.

A reduction larger than 25 percent is not appropriate.  The claims on which the plaintiff failed and the claim on which it prevailed were too interrelated and reliant on the same evidence to support a reduction of more than 25 percent.  The plaintiff's claims, both successful and unsuccessful, depended on the same discovery and the same arguments.  The case presented distinctive facts with no clearly dispositive legal precedent.

The plaintiff seeks $102,899.77 in attorney's fees.  The plaintiff spent 33.2 hours applying for EAJA fees and responding to the defendant's opposition brief, corresponding to $6,716.36 in fees.  The plaintiff is granted that amount in full.  *Cf. Jean*, 496 U.S. at 162 (presuming that EAJA fees should be awarded as a whole).

Of the remaining $96,183.41 requested attorney's fees, the Court has already deducted $7,323.26, corresponding to fees for the plaintiff's unsuccessful motion for summary judgment.

The remaining $88,860.15 in requested fees should be reduced by 25 percent, leaving the plaintiff with $66,645.11.  Combined with the fees the plaintiff incurred in drafting and defending its EAJA motion ($6,716.36), the plaintiff is entitled to a total of $73,361.47 for attorney's fees.

The plaintiff also requests reimbursed research expenses of $3,159.22, from which the Court has deducted $456.38.  The Court will award the full amount of these remaining costs ($2,702.84).  The plaintiff is therefore entitled to an award of $76,064.31.

---

(2013) (reducing attorney's fees by 50 percent, 80 percent, and 60 percent at different stages of the litigation).

## III.    CONCLUSION

The plaintiff is eligible for a fee award under the EAJA.  The plaintiff is a prevailing party, and the government's position was not substantially justified.  A reduction of the fee award, however, is reasonable given the plaintiff's limited success.  The plaintiff's application for fees is granted in part and the plaintiff is awarded $76,064.31 in fees and costs under the EAJA.

The Court will enter an order in accordance with this memorandum opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**